STATE of Missouri, Respondent,

v.

David A. TODD, Appellant.

No. WD 58855.

Missouri Court of Appeals, Western District.

Jan. 22, 2002.

Motion for Rehearing and/or Transfer to Supreme Court Denied March 5, 2002.

Application for Transfer Denied April 23, 2002.

Ellen H. Flottman, Asst. Public Defender, Columbia, for appellant.

Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before: NEWTON, P.J., LOWENSTEIN and SMART, JJ.

HAROLD L. LOWENSTEIN, Judge.

Appellant, David A. Todd, appeals from his conviction and sentence of a total of twenty-one years for four counts of possession of ephedrine with intent to manufacture, § 195.246,[1] seven counts of creation of a controlled substance, § 195.420, five counts of the unlawful use of drug paraphernalia, § 195.233, and five counts of the attempt to manufacture methamphetamine, § 195.211. The judgment is affirmed in part and reversed in part.

## Factual and Procedural History

### A. Background Facts

In the summer of 1999, Mark A. Morgan (Morgan), a Pettis County deputy sheriff, was working as an undercover narcotics officer in Sedalia, Missouri. Morgan got a job at Rival Manufacturing in Sedalia and began socializing with fellow employees after work, mainly at Ed Nowell's (Nowell's) house. In July of 1999, Morgan met the appellant, Todd, for the first time at Nowell's house when Todd showed up there and announced he wanted to "do a cook." Approximately a month later when Morgan went to Nowell's house, Todd, Nowell and David L. Paxton (L.Paxton) were there, the house was full of smoke and it smelled like chemicals. Morgan saw Todd take some glass jars containing a liquid out to an older model tan or yellow van. Todd announced that he was "going to finish it."

Morgan also met a woman named Andrea while working at Rival. In August of 1999, when Morgan and Andrea were at Nowell's house, Andrea stated that she wanted some "speed" and Nowell suggested that she ask Todd for some. Morgan drove Andrea to Todd's house. When Andrea asked Todd if he had any speed, he said he did not and suggested that she try back later.

On September 7, 1999, Morgan was at Nowell's house when Todd stopped by to get some coffee filters. Approximately two weeks later, on September 23, 1999, Morgan had a conversation with Todd concerning a portable spotlight Todd had with him. Todd told Morgan that he planned to use the spotlight to shine it in the eyes of law enforcement if they were pursuing him so that he could throw things out the window of his vehicle.

### B. October 3, 1999 (Counts I—IV)

On October 3, 1999, Morgan was at Nowell's house when Todd arrived carrying a couple bottles of pills. Todd asked if either Nowell or Morgan had any lithium batteries. Morgan gave him the battery from his flashlight in exchange for $11. Todd peeled the outer casings of the battery off with a pair of pliers. He then crushed the pills with a car antenna, put the powder in a bottle, and placed the bottle in his van. When he returned to Nowell's house he was carrying candy jars under his coat. He took the jars to a back bedroom and asked Nowell and Morgan to go buy him some kerosene and more pills. Morgan drove Nowell to a Conoco gas station where Nowell obtained a can of kerosene and one bottle of pills. When they returned to Nowell's house, Nowell took the kerosene and bottle of pills to Todd. When Todd came out of the bedroom he was carrying some jars and coffee filters. He shook a white substance off of the coffee filters onto a mirror, and then chopped it up into a powder with Morgan's driver's license. Todd divided the powder giving half to himself and half to Nowell.

This sequence of events gave rise to Todd's charges for Counts I through IV. Count I, possession of pseudoephedrine with the intent to manufacture metham-

---

1. All statutory references are to RSMo 2000, unless otherwise indicated.

phetamine, § 195.246; Count II, creation of a controlled substance by possessing lithium with the intent to manufacture methamphetamine, § 195.420; Count III, unlawful use of drug paraphernalia, by possessing pliers, a car antennae, and coffee filters with the intent to manufacture methamphetamine, § 195.233; and Count IV, attempt to manufacture methamphetamine, § 195.211.

### C. October 7–8, 1999 (Counts V—VII) (Todd's Point I.)

On October 7, 1999, Morgan was at Nowell's house when a dark green Lincoln Navigator, driven by someone named "Ricky," pulled in front of the house. Todd, his girlfriend LaCrista Neel (Neel), and L. Paxton all got out of the vehicle. Todd had two cans of Toluene that he put in L. Paxton's blue four-door Chevrolet Impala.

On the following evening, October 8, 1999, two Pettis County sheriff's deputies were dispatched to the Longwood area in the northeast part of Pettis County to investigate reports of suspicious activity at a trailer. It was dark when they arrived. They observed a Chevrolet Caprice parked on one side of the trailer. David W. Paxton (W.Paxton) and L. Paxton, were standing on each side of the car. When the deputies announced themselves, they heard a vehicle start. A white van drove around the north end of the trailer.

William J. Connor (Deputy Connor), also a Pettis County sheriff's deputy, received a radio dispatch containing a description and license plate number of the van. Deputy Connor was parked at an intersection and was looking at a map when a van drove by. Deputy Connor began following the van and noticed flashes of light coming from the driver's side. He then activated the lights and siren on his car. The van speeded up and continued to shine the spotlight towards Deputy Connor's vehicle. While following the van, Deputy Connor observed what appeared to be two-gallon jugs or cans being thrown from the van. Deputy Connor's car struck one of the jugs or cans.

After pursuing the van for several miles, it finally stopped when it got stuck in mud. A man and a woman got out of the van and ran. Deputy Connor captured Neel in the woods not far from the van and ordered Todd, who was hiding in the woods, to surrender. Deputy Connor went back to where the two cans or jugs were tossed out of the van and recovered two cans of Toluene.

The Paxton vehicle that was parked next to the trailer was towed and searched. Deputies found coffee filters containing pills in the glove compartment and a receipt from Dugan Paint for Toluene. Inside the trailer the deputies found a tank of anhydrous ammonia, a "For Sale" sign for the white van, coffee filters, a smoker, an empty pseudoephedrine pill bottle, a modified fire extinguisher, a fifty-five gallon drum that had been cut in half, and a pressurized silver container.

Based on this incident, Todd was charged with Counts V through VII: Count V, creation of a controlled substance, by possessing anhydrous ammonia with the intent to distribute methamphetamine, § 195.420; Count VI, attempt to manufacture methamphetamine, § 195.211; and Count VII, unlawful use of drug paraphernalia by possessing coffee filters, anhydrous ammonia, plastic containers and spoons with the intent to manufacture methamphetamine, § 195.233.

### D. November 19—22 (Counts VIII—X)

Morgan was arrested for carrying a concealed weapon by officers who did not know that he was an undercover deputy.

Morgan used the arrest to tell Todd that he need to make some fast money to get out of town. Morgan asked Todd what $1,500 "would get him," meaning that he wanted to purchase methamphetamine. Todd told Morgan that he would have to "participate," because he believed that would preclude Morgan from setting him up.

On November 19, 1999, Morgan and Todd went to the Conoco station to purchase pseudoephedrine. Conoco only allowed customers to buy two bottles at a time, so they each purchased two bottles and went back on November 20 and each bought two more. With a total of eight bottles, they had enough to make an ounce of methamphetamine.

At approximately 4:30 a.m. on November 22, 1999, Todd, Morgan, Karen Dixon (Dixon), W. Paxton, and Neel were in Todd's garage when they decided to try and get some anhydrous ammonia. They were unsuccessful. Later that morning, W. Paxton told Todd that he and two of his friends had made a plan to get some anhydrous ammonia and that Todd should get set up for it. Morgan helped Todd find pipes, fittings and parts from a fire extinguisher that W. Paxton could used to tap off the anhydrous ammonia tank. They attached the fittings and a hose from a fire extinguisher to an orange Igloo cooler, in which they planned to store the anhydrous ammonia. Todd put the cooler into the trunk of W. Paxton's car, and Paxton and his companions left.

Two Pettis County sheriff's deputies stopped W. Paxton's car after they determined that the vehicle's license plate was registered to a different car. Before W. Paxton's vehicle stopped, someone threw something out of the right front passenger window. The deputies later recovered a pill bottle that was half full of white crushed powder. They also found another pill bottle that was wrapped in black electrical tape and contained lithium batteries and some crushed pills. Inside the trunk of the car the deputies found a mason jar, a cooler, and some hoses.

Morgan and L. Paxton, were in Todd's garage listening to a police scanner when they learned that the other men had been stopped. They went inside and told Todd. Todd and a man named Danny Lloyd (Lloyd) told Morgan that he should act as a decoy to any other police who came by so that Todd, Lloyd and Neel could leave Todd's house to obtain some anhydrous ammonia. Morgan did as Lloyd said, and was pursued by all the cars patrolling in the area. Morgan went back to Todd's house, and when Todd and the others returned, Todd told Morgan that they had gotten some anhydrous ammonia. Todd took a white bucket out of the back of Lloyd's car and put it in the back of his white pickup truck. Todd told Morgan that he needed to go put the anhydrous ammonia in a container before it evaporated, and asked Morgan to go purchase four lithium batteries. Morgan went to Wal Mart and bought four lithium batteries.

Based on this incident, Todd was charged with Counts VIII—X: Count VII, possession of pseudoephedrine on November 19, 1999, with intent to manufacture methamphetamine, § 195.246; Count IX, possession of pseudoephedrine on November 20, 1999, with intent to manufacture methamphetamine, § 195.246, and Count X, unlawful use of drug paraphernalia in that he possessed a container, valve and hose with intent to manufacture methamphetamine, § 195.233.

### E. November 23, 1999
### (Counts XI—XIV)

On November 23, 1999, as Todd was getting ready to go to his farm to begin the "cook," he asked Morgan to purchase

four lithium batteries. Morgan purchased four lithium batteries at Wal–Mart and then met Todd, Neel, and Neel's sister, Heather, at Todd's farm. Morgan also brought along eight bottles of pseudoephedrine. Todd asked Morgan to give him the lithium batteries, and Todd proceeded to peel the batteries with a pair of pliers. Meanwhile, Morgan consolidated the pills into two bottles. Todd took a bottle of the pills and began crushing them with a plastic tent stake. Todd instructed Morgan to do the same with the other bottle of pills.

While Morgan was crushing pills, Todd tapped an acetylene tank that had been buried under leaves. Todd filled a glass mason jar approximately a quarter of the way full with anhydrous ammonia, added the crushed pseudoephedrine pills and lithium, and then stirred the mixture until the anhydrous ammonia evaporated. Todd put the resulting mixture in the back of his truck and helped Morgan do the same process in another jar.

Based on this incident, Todd was charged with Count XI, creation of a controlled substance by possessing lithium with the intent to manufacture methamphetamine, § 195.420; Count XII, creation of a controlled substance by possessing anhydrous ammonia with the intent to manufacture methamphetamine, § 195.420, Count XIII; attempt to manufacture methamphetamine, § 195.211; and Count XIV, possession of ephedrine with the intent to manufacture methamphetamine, § 195.246.

### F. November 24–25, 1999 (Counts XV—XVIII)

The following day, November 24, 1999, Todd, Morgan, and the others listed above went back to Todd's farm. Todd continued to work on his "cook" by pouring Toluene into a jar and asking Neel to make a "smoker." A "smoker" is usually a liter or sixteen-ounce soda bottle cut in half with a clear plastic tube inserted through the opening. Regular table salt is poured into the bottom of the bottle and a dash of sulfuric acid or drain cleaner is added to the salt. This process creates an acid smoke which "smokes" the Toluene.

Morgan saw Todd get some Toluene from his trailer. Todd poured the Toluene into the jar and began to stir it. After it sat for a while, Todd used a paper plate to filter all of the binders out, "smoked" the clear Toluene until it turned cloudy, and poured the remains through a coffee filter into another jar. The substance left in the coffee filter dries out and becomes powdered methamphetamine. After the methamphetamine dried, Todd poured it onto a mirror and chopped it up with either a credit card or razor blade.

Morgan left Todd's farm late on November 24 and returned early the next morning. When Morgan arrived, Todd was already there working on another "cook." He had crushed some pills in glass jars and took a Coleman drink cooler down to a dump truck, tapped off some anhydrous, brought it back to the trailer and poured it into a glass jar. He then inserted some lithium strips, added the pseudoephedrine pills, and stirred the mixture.

Gerald Todd (Gerald), appellant's brother, arrived and started working on another batch of methamphetamine. Todd told Morgan to get his stuff, and they all went inside the trailer. Gerald had a clear Pyrex dish with a blue lid that contained a white powder. Gerald and Todd went down to the dump truck and got some anhydrous ammonia to mix the powdered pills with. Gerald also brought batteries with him. When he was unsuccessful at peeling them, Todd peeled the batteries for him. Then Todd, Gerald and Morgan worked on their "cooks" in the trailer.

Todd showed Morgan how to "smoke" and filter his batch.

Morgan kept some of the materials used in the "cook" and later turned them over to another sheriff's deputy. The items included: coffee filters containing pseudoephedrine, a paper plate that was used as a filter which was found to contain methamphetamine, a glass jar that also contained methamphetamine, and some finished product, which turned out to be only pseudoephedrine.

Following Todd's arrest, a search warrant was issued for his residence. Officers seized a gray toolbox containing various jars, filters, trash, drain cleaner, a thermal cooler, lithium battery strips, empty pill containers, a fire extinguisher, containers, a wooden spoon, hand scales, rock salt, a microwave, aluminum foil, a Coleman fuel can, a full can of Toluol, a handmade smoker, a Coleman cooking burner, Red Devil lye, Heet, and an oxygen tank that contained anhydrous ammonia. A cup found in the toolbox contained pseudoephedrine as well as another cup and a jar that contained methamphetamine. A clear glass vial found in the kitchen contained methamphetamine, and a Dollar General Store bag found in the burn pile contained both methamphetamine and pseudoephedrine residue.

Base on this incident, Todd was charged with Count XV, creation of a controlled substance by possessing lithium with the intent to manufacture methamphetamine, § 195.420, Count XVI; creation of a controlled substance by possessing anhydrous ammonia with the intent to manufacture methamphetamine, § 195.420; Count XVII, attempt to manufacture methamphetamine, § 195.211; and Count XVIII, the unlawful use of drug paraphernalia by possessing coffee filters, a plastic bottle, rubber tubing, and glass jars with the intent to manufacture methamphetamine, § 195.233.

## G. February 13, 2000 (Counts XIX—XXI) (Todd's Point I.)

At approximately 3:00 a.m. on February 13, 2000, Morgan saw Dixon's gray Cadillac as he was driving down Highway 5. By the time Morgan turned around, the car had stopped near a trailer, all of the passengers were out of the car, and the trunk was open. Morgan observed someone putting a container in the trunk of the type that anhydrous ammonia is put in. The car then left from the trailer. Morgan called a police officer that knew of his undercover operation and told him that a "cook" had either just happened or was about to happen.

Dixon's car was stopped and searched. W. Paxton was the driver and only occupant of the car. The officers found a silver pressurized container and a microwave oven in the trunk of the car. The trunk had a strong anhydrous ammonia smell. A blister pack of pills and a bottle of Heet were recovered from the back passenger side floorboard.

A couple hours later, sheriff's deputies arrived at Dixon's trailer. Without prompting, Dixon asked the officers if they were looking for Todd and Neel and told them they were not there. Dixon gave one of the officers permission to walk through the trailer to make sure no one else was there. The officer saw a large glass container full of liquid in the bathtub and a smoker sitting on a piece of carpet. A jar of muriatic acid was under the bathroom sink.

As the officers searched the house they found coffee filters, a plastic baggie with a white powdery residue, and cups with residue. The residue in the cups was later determined to be methamphetamine and the residue in the baggie was pseu-

doephedrine. Syringes, pillboxes, paper plates, coffee filters, foil wrappers from Sudafed pills, and battery wrappings were found in Dixon's trash. In a back bedroom officers found a glass jar, a set of scales, a mirror, and razor blades.

When an officer approached the closed door of another bedroom, Dixon told him that Todd and Neel were inside. The officer opened the door and found Todd and Neel lying on the floor with the light off. Items seized from that room included insulin needles and a clear glass separator with holes in it to insert plastic tubing.

Outside the trailer, officers also found a soda bottle "tank" covered in plastic and duct tape approximately twenty-yards from the trailer. The tank smelled like ammonia; and when it was ruptured by the officers, it exploded and formed a cloud. Todd did not have any drug paraphernalia on his person at the time of his arrest; however, Neel was found with rubber tubing.

Based on this incident, Todd was charged with Count XIX, creation of a controlled substance by possessing anhydrous ammonia with the intent to manufacture methamphetamine, § 195.420; Count XX, attempted manufacture of methamphetamine, § 195.211; and Count XXI, unlawful use of drug paraphernalia by possessing coffee filters, anhydrous ammonia, rubber tubing, glassware, and a smoker with the intent to manufacture methamphetamine, § 195.233.

Todd was found guilty after a jury trial on all twenty-one counts. He was sentenced to a total of twenty-one years imprisonment as follows: Count I—one year; Count II—one year; Count III—one year; Count IV—five years; Count V—two years; Count VI—five years; Count VII—one year; Count VIII—three years; Count IX—three years; Count X—two years; Count XI—three years; Count XII—five years; Count XIII—eight years; Count XIV—three years; Count XV—three years; Count XVI—three years; Count XVII—eight years; Count XVIII—three years; XIX—three years; Count XX—eight years; and Count XXI—four years.

Counts I through IV are to run concurrently; Counts V through VII are to run concurrently, but consecutively to Counts I through IV; Counts VIII through X are to run concurrently, but consecutively to Counts V through VII; Counts XI through XVIII are to run concurrently, but consecutively to Counts VIII through X; Counts XIX through XXI are to run concurrently, and concurrently with Counts XI through XVIII. Facts pertinent to the challenged counts will be recited again as necessary.

## I.

Todd argues in his first point that the trial court erred in convicting and sentencing him as to Counts V, VI, and VII, arising from events at the Longwood, Missouri trailer, and Counts XIX, XX, and XXI, arising from events at Dixon's trailer, because the State did not present sufficient evidence from which a rational trier of fact could have reached a "subjective state of near certitude" that Todd constructively possessed the contraband or attempted to manufacture methamphetamine at the Longwood trailer or Dixon trailer.

### A. Standard of Review

In considering a challenge to the sufficiency of the evidence, this court accepts as true all evidence and its inferences in a light most favorable to the verdict, and we reject all contrary evidence and inferences. *State v. Goddard*, 34 S.W.3d 436, 438 (Mo.App.2000) (citing *State v. Grim*, 854 S.W.2d 403, 405 (Mo.

banc 1993)). " 'The function of the reviewing court is not to reweigh the evidence, but to determine if the conviction is supported by sufficient evidence.' " *State v. Agee,* 37 S.W.3d 834, 836 (Mo.App.2001) (quoting *State v. Dawson,* 985 S.W.2d 941, 946 (Mo.App.1999)). This Court is charged with the responsibility of determining whether all of the evidence, direct and circumstantial, is sufficient to provide any rational juror with proof beyond a reasonable doubt of each of the elements of the crime charged. *State v. Butler,* 24 S.W.3d 21, 48 (Mo.App.2000).

### B. Counts V, VI, VII (Longwood, Missouri Trailer)

These counts were derived from events occurring on October 7 8, 1999. Morgan, the undercover deputy, was at Nowell's house when a dark green Lincoln Navigator, driven by someone named "Ricky" pulled in front of the house. Todd, Todd's girlfriend Neel, and L. Paxton all got out of the vehicle. Todd had two cans of Toluene that he put in Paxton's blue four-door Chevrolet Impala.

On the following evening, October 8, 1999, Pettis County sheriff's deputy Douglas Retherford (Deputy Retherford), and detective Tim Carr (Detective Carr), were dispatched to the Longwood area in the northeast part of Pettis County to investigate reports of suspicious activity at a trailer home. It was dark when they arrived. They observed a Chevrolet Caprice parked on one side of the trailer. L. Paxton and W. Paxton were standing on each side of the car. When the deputies announced themselves, they heard a vehicle start. A white van drove around the north end of the trailer.

Deputy Connor received a radio dispatch containing a description and license plate number of the van. Deputy Connor was parked at an intersection and was looking at a map when a van drove by. Deputy Connor began following the van and noticed flashes of light coming from the driver's side. He activated the lights and siren on his car. The van increased speed and continued to shine the spotlight towards Deputy Connor's vehicle. While following the van, Deputy Connor observed what appeared to be two gallon jugs or cans being thrown from the van. Deputy Connor's car struck one of the jugs or cans.

After Deputy Connor pursued the van for several miles, the van finally stopped when it got stuck in mud. A man and a woman got out of the van and ran. Deputy Connor captured Neel in the woods not far from the van and ordered Todd, who was hiding in the woods, to surrender. Deputy Connor went back to where the two cans were tossed out of the van and recovered two cans of Toluene.

The Paxton vehicle that was parked next to the trailer was towed and searched. Deputies found coffee filters containing pills in the glove compartment and a receipt from Dugan Paint for Toluene. Inside the trailer the deputies found a tank of anhydrous ammonia, a "For Sale" sign for the white van, coffee filters, a smoker, an empty pseudoephedrine pill bottle, a modified fire extinguisher, a fifty-five gallon drum that had been cut in half, and a pressurized silver container.

Todd was charged with Count V, creation of a controlled substance, by possessing anhydrous ammonia with the intent to distribute methamphetamine, § 195.420; Count VI, attempt to manufacture methamphetamine, § 195.211; and Count VII, unlawful use of drug paraphernalia by possessing coffee filters, anhydrous ammonia, plastic containers and spoons with the intent to manufacture methamphetamine, § 195.233.

### 1. Count V

In Count V of the information, Todd was charged with the Class C felony of creation of a controlled substance, in that "the defendant, acting together with LaCrista Neel, David L. Paxton, and David W. Paxton, knowingly possessed anhydrous ammonia, a precursor ingredient of methamphetamine, with the intent to manufacture methamphetamine."

Section 195.420.1 states:

1. It is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400, or reagents, or solvents, or any other chemical proven to be precursor ingredients of methamphetamine or amphetamine, as established by expert testimony pursuant to subsection 3 of this section, with the intent to manufacture, compound, convert, produce, process, prepare, test, or otherwise alter that chemical to create a controlled substance or a controlled substance analogue in violation of section 195.005 to 195.425.

The State argues that Todd has been charged under all six of the challenged counts under an acting-in-concert theory. With regard to accomplice liability, Missouri has eliminated the distinction between principals and accessories. *State v. Bradshaw*, 26 S.W.3d 461, 469 (Mo.App. 2000). "Now, all persons who act in concert to commit a crime are equally guilty." *Id.* Section 562.041.1 provides, in pertinent part:

1. A person is criminally responsible for the conduct of another when

\* \* \*

(2) Either before or during the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense.

■■■■ " 'To make a submissible case of aiding and abetting, there must be some evidence that defendant associated himself with the venture or participated in the crime in some manner.' " *Bradshaw*, 26 S.W.3d at 469 (quoting *State v. Chambers*, 998 S.W.2d 85, 91 (Mo.App.1999)). The evidence does not have to show that the defendant personally committed every element of the crime. *State v. Barnum*, 14 S.W.3d 587, 591 (Mo. banc 2000). In fact, "any evidence that shows affirmative participation in aiding the principal to commit the crime is sufficient to support the conviction." *State v. Clay*, 975 S.W.2d 121, 139 (Mo. banc 1998). Associating with individuals that committed a crime before, during, or after its occurrence and/ or attempting flight from the crime scene are factors which may be considered. *Barnum*, 14 S.W.3d at 591.

To convict Todd of creation of a controlled substance under a theory of accomplice liability, the State was required to prove that: 1) Todd, Neel, L. Paxton, or W. Paxton possessed anhydrous ammonia with the intent to create a controlled substance; and 2) that with the purpose of promoting or furthering the creation of a controlled substance, Todd acted together with or aided Neel, L. Paxton, or W. Paxton, with the intent to manufacture a controlled substance. Section 562.041.1(2); MAI–CR3d 304.04; MAI–CR3d 325.34.

Here, the anhydrous ammonia at issue was found inside the trailer. When the sheriff's deputies announced their presence at the trailer, W. Paxton and L. Paxton were standing outside a car parked next to the trailer. Todd and Neel fled the scene in a white van. Thus, when the deputies arrived, none of the individuals had actual possession of the anhydrous ammonia.

The Supreme Court of Missouri has used the same standards of actual or constructive possession in manufacturing cases as used in possession cases. *State v. Smith*, 33 S.W.3d 648, 653 (Mo.App.2000). A person has actual possession of a substance if he or she has the substance on his or her person or within his or her easy reach and convenient control. *Agee*, 37 S.W.3d at 836. Constructive possession, on the other hand, is where a person has the power and intention at a given time to exercise dominion over the substance either directly or through another person or persons. *Id.* "In order to prove constructive possession, the state must, at a minimum, establish that the defendant had access to and control over the premises where the substance was located." *State v. West*, 21 S.W.3d 59, 63 (Mo.App.2000). "Where a person is present on premises where drugs are found but does not have exclusive use or possession of the premises, it may not be inferred that he had knowledge of the presence of the drugs or had control, so that no submissible case is made." *Id.* Additional factors are required and the totality of the circumstances should be considered in determining whether sufficient additional incriminating circumstances have been proved. *Id.*

None of the individuals involved were discovered inside the trailer where the anhydrous ammonia was found. W. Paxton and L. Paxton were standing by a car outside the trailer when the deputies arrived, and Todd and Neel left the area in a van. It also cannot be said that any of these individuals had exclusive use or possession of the trailer. Deputy Retherford testified that from the appearance of the trailer it did not look as if anyone lived there, and Detective Carr described the trailer as abandoned. This evidence does not establish a submissible case for constructive possession of the anhydrous ammonia. The other incriminating circumstances included Todd and Neel leaving the trailer area in a van, flashing a spotlight at Deputy Connor's car, throwing two jugs of Toluene from their vehicle, fleeing after the van got stuck in mud, and the discovery of coffee filters containing pills in the glove compartment of the Paxton vehicle. While these occurrences are factors to be considered in the totality of the circumstances, in and of themselves they are insufficient to show possession of the anhydrous ammonia located in the trailer. The evidence was insufficient to prove Count V.

### 2. Count VI

In Count VI of the information, Todd was charged with the Class B felony of attempt to manufacture a controlled substance, in that "the defendant, acting together with LaCrista Neel, David L. Paxton, and David W. Paxton, combined pills containing pseudoephedrine and anhydrous ammonia, and possessed equipment and toluene, and such conduct was a substantial step toward the commission of the crime of manufacture of methamphetamine and was done for the purpose of committing that crime."

Section 195.211.1 states:

1. Except as authorized by section 195.005 to 195.425 and except as provided in section 195.222, it is unlawful for any person to distribute, deliver, manufacture, produce or attempt to distribute, deliver, manufacture or produce a controlled substance or to possess with intent to distribute, deliver, manufacture, or produce a controlled substance.

To convict Todd of an attempt to manufacture methamphetamine under a theory of accomplice liability, the State was required to prove that: (1) Todd, Neel, L. Paxton or W. Paxton attempted to manufacture methamphetamine; and 2) Todd,

with the purpose of promoting or furthering the commission of that attempt to manufacture methamphetamine, acted together with or aided Neel, L. Paxton or W. Paxton in committing that offense. *State v. Wurtzberger*, 40 S.W.3d 893, 896 (Mo. banc 2001); §§ 564.011 and 562.041.1(2); MAI–CR3d 304.04; MAI–CR3d 304.06.

▮▮▮▮▮ Attempt to manufacture methamphetamine has two elements that the State must prove: 1) the defendant had the purpose of committing the underlying offense (manufacturing methamphetamine), and 2) the doing of an act which constitutes a substantial step toward the commission of that offense. *West*, 21 S.W.3d at 64. A "substantial step" is an act that is "strongly corroborative of the firmness of the actor's intent to complete the commission of the offense." *Id.;* § 564.011.1. The conduct must be indicative of the defendant's purpose to complete the offense. *State v. O'Brien*, 5 S.W.3d 532, 534 (Mo.App.1999). "The act or conduct that will fulfill the substantial step requirement depends on the facts of the particular case." *West*, 21 S.W.3d at 64. "A substantial step or overt act towards the commission of the crime must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime." *O'Brien*, 5 S.W.3d at 534.

▮▮▮▮ Here, the State's theory was that Todd and or the other individuals combined pills containing pseudoephedrine and anhydrous ammonia, and possessed equipment and Toluene, which amounted to a substantial step toward the manufacture of methamphetamine.

As stated *supra*, the anhydrous ammonia found in the trailer was not actually or constructively possessed by Todd or his alleged accomplices. This finding is extended here to other items or equipment located in the trailer. The only other items remaining are the two jugs of Toluene thrown from the window of the van by Neel or Todd, and the coffee filters with pills in them, and the receipt for Toluene found in the Paxton vehicle. It must, therefore, be determined whether possession of these items is a substantial step towards the manufacture of methamphetamine. While, Toluene, coffee filters, and pills can be used to manufacture methamphetamine, they also have valid uses and are legal to possess. In fact, the pills found in the coffee filters were never identified as anything other than "pills." No evidence was presented by the State that the pills contained pseudoephedrine or any other ingredient used in the manufacture of methamphetamine. Possession of these items was insufficient to prove that Todd, Neel, W. Paxton or L. Paxton, intended to manufacture methamphetamine or took a step beyond mere preparation. *Id.* While the jury may have been entitled to be suspicious of the possession of these items, it did not provide a sufficient basis for concluding, without speculation, that Todd, Neel, W. Paxton or L. Paxton, intended to manufacture methamphetamine or that they took a substantial step toward the manufacture of methamphetamine. *Id.* This evidence was insufficient to support Todd's conviction for Count VI.

### 3. Count VII

In Count VII of the information, Todd was charged with the Class D felony of unlawful use of drug paraphernalia, in that "the defendant, acting together with La-Crista Neel, David L. Paxton, and David W. Paxton, possessed coffee filters, containers of anhydrous ammonia, plastic containers and spoons, with the intent to use the paraphernalia to manufacture and produce methamphetamine."

Section 195.233.1 states:

It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or an imitation controlled substance in violation of sections 195.005 to 195.425.

To convict Todd of the unlawful use of drug paraphernalia under a theory of accomplice liability, the State was required to prove that: 1) Todd, Neel, L. Paxton or W. Paxton possessed coffee filters, containers of anhydrous ammonia, plastic containers and spoons with the intent to use the items to manufacture methamphetamine; and 2) with the purpose of promoting or furthering the commission of that possession of drug paraphernalia with intent to use, Todd acted together with or aided Neel, L. Paxton or W. Paxton in committing that offense. Section 562.041.1(2); MAI–CR3d 325.22; MAI–CR3d 304.04.

 As stated *supra*, items found in the trailer were not actually or constructively possessed by Todd or the other individuals. The only item listed in Count VII that was found somewhere other than the trailer was the coffee filters found in the Paxton vehicle. While coffee filters can be used in the manufacture of methamphetamine, they have valid uses and are also legal to possess. This evidence was insufficient to support Todd's conviction for Count VII.

## C. Counts XIX, XX, XXI (Dixon Trailer)

The following counts were the product of events occurring on February 13, 2000. At approximately 3:00 a.m., Morgan, the undercover deputy, saw Dixon's gray Cadillac as he was driving down Highway 5.

By the time Morgan turned around, the car had stopped near a trailer. All of the passengers were out of the car and the trunk was open. Morgan observed someone putting a container in the trunk of the type that anhydrous ammonia is kept in. The car then left from the trailer. Morgan called a police officer that knew of his undercover operation and told him that a "cook" had either just happened or was about to happen.

Dixon's car was stopped and searched. W. Paxton was the driver and only occupant of the car. The officers found a silver pressurized container and a microwave oven in the trunk of the car. The trunk had a strong anhydrous ammonia smell. A blister pack of pills and a bottle of Heet was recovered from the back passenger side floorboard.

A couple hours later, sheriff's deputies arrived at Dixon's trailer. Without prompting, Dixon asked the officers if they were looking for Todd and Neel and told them they were not there. Dixon gave one of the officers permission to walk through the trailer to make sure no one else was there. The officer saw a large glass container full of liquid in the bathtub and a smoker sitting on a piece of carpet. A jar of muriatic acid was under the bathroom sink.

As the officers searched the house they found coffee filters, a plastic baggie with a white powdery residue, and cups with residue. The residue in the cups was later determined to be methamphetamine and the residue in the baggie was pseudoephedrine. Syringes, pillboxes, paper plates, coffee filters, foil wrappers from Sudafed pills, and battery wrappings were found in Dixon's trash. In a back bedroom officers found a glass jar, a set of scales, a mirror, and razor blades.

When an officer approached the closed door of another bedroom, Dixon told him that Todd and Neel were inside. The officer opened the door and found Todd and Neel lying on the floor with the light off. Items seized from that room included insulin needles and a clear glass separator with holes in it to insert plastic tubing.

Outside the trailer, officers also found a soda bottle "tank" covered in plastic and duct tape approximately twenty-yards from the trailer. The tank smelled like ammonia and when it was ruptured by the officers it exploded and formed a cloud. Todd did not have any drug paraphernalia on his person at the time of his arrest; however, Neel was found with rubber tubing.

Todd was charged with Count XIX, creation of a controlled substance by possessing anhydrous ammonia with the intent to manufacture methamphetamine, § 195.420; Count XX, attempted manufacture of methamphetamine, § 195.211; and Count XXI, unlawful use of drug paraphernalia by possessing coffee filters, anhydrous ammonia, rubber tubing, glassware, and a smoker with the intent to manufacture methamphetamine, § 195.233. All of these counts are also based on accomplice liability discussed *supra*.

### 1. Count XIX

In Count XIX of the information, Todd was charged with the Class C felony of creation of a controlled substance, in that "the defendant, acting together with La-Crista Neel, David W. Paxton, and Karen Dixon, knowingly possessed anhydrous ammonia, a precursor ingredient of methamphetamine, with the intent to manufacture methamphetamine."

Section 195.420.1 states:

1. It is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400, or reagents, or solvents, or any other chemical proven to be precursor ingredients of methamphetamine or amphetamine, as established by expert testimony pursuant to subsection 3 of this section, with the intent to manufacture, compound, convert, produce, process, prepare, test, or otherwise alter that chemical to create a controlled substance or a controlled substance analogue in violation of section 195.005 to 195.425.

To convict Todd of creation of a controlled substance under a theory of accomplice liability, the State was required to prove that: 1) Todd, Neel, W. Paxton, or Dixon possessed anhydrous ammonia with the intent to create a controlled substance; and 2) that with the purpose of promoting or furthering the creation of a controlled substance, Todd acted together with or aided Neel, W. Paxton or Dixon, with the intent to manufacture a controlled substance. Section 562.041.1(2); MAI–CR3d 304.04; MAI CR3d 325.34.

Here, the anhydrous ammonia tank was found twenty-yards away from Dixon's trailer. While neither Todd nor his alleged accomplices had actual possession of the tank of anhydrous ammonia, it must be determined whether any of the individuals had constructive possession of the substance. The most likely individual to have had constructive possession of the anhydrous ammonia was Dixon since she lived in the trailer.

Constructive possession occurs when a person has the power and intention at a given time to exercise dominion over a substance either directly or through another person or persons. *Agee*, 37 S.W.3d at 836. "In order to prove constructive possession, the state must, at a minimum, establish that the defendant had access to and control over the premises where the substance was located." *West*, 21 S.W.3d

at 63. Exclusive possession of the premises containing the materials raises an inference of possession and control. *Id.*

 While Dixon did reside in the trailer, it is unclear from the record whether she rented it or owned it. This question is pertinent in that the tank of anhydrous ammonia was found twenty-yards away from the trailer. If Dixon owned the trailer and the land surrounding the trailer, a presumption could possibly be made that she had exclusive possession of the premises, and, thus, control over the tank of anhydrous ammonia. Deputy Morgan testified that Dixon lived in the trailer, but he did not know if she owned it. He testified that the trailer Dixon lived in was located by the Sedalia Auto Auction, that Dixon worked for the Sedalia Auto Auction, and that he thought "it was just a deal she worked out with them."

This is the only evidence from the record as to the nature of Dixon's possessory rights with regard to the trailer. Based on this evidence, it is not possible to conclude that Dixon had exclusive possession of the premises or constructive possession of the tank of anhydrous ammonia. The tank was found twenty-yards from the trailer on property potentially owned by the Sedalia Auto Auction or some other party. This evidence is insufficient to prove that Dixon, as an accomplice of Todd, possessed anhydrous ammonia, which is an element of creation of a controlled substance. The State is required to prove beyond a reasonable doubt each and every element of the charged offense. *State v. Scurlock,* 998 S.W.2d 578, 582 (Mo.App.1999). The evidence in this record was insufficient to support a conviction on Count XIX.

### 2. Count XX

In Count XX of the information, Todd was charged with the Class B felony of attempt to manufacture a controlled substance, in that "the defendant, acting together with Lacrista Neel, David W. Paxton, and Karen Dixon, collected together anhydrous ammonia, rubber tubing, glassware, muriatic acid, sulfuric acid, Epsom salt, lithium batteries, a spray pump, a homemade 'smoker' to produce hydrogen chloride, and razor blades, and used these items in an attempt to combine pills containing pseudoephedrine, parts of lithium batteries and anhydrous ammonia, and such conduct was a substantial step toward the manufacture of methamphetamine and was done for the purpose of committing that crime."

Section 195.211.1 states:

1. Except as authorized by section 195.005 to 195.425 and except as provided in section 195.222, it is unlawful for any person to distribute, deliver, manufacture, produce or attempt to distribute, deliver, manufacture or produce a controlled substance or to possess with intent to distribute, deliver, manufacture, or produce a controlled substance.

To convict Todd of an attempt to manufacture methamphetamine under a theory of accomplice liability, the State was required to prove that: (1) Todd, Neel, W. Paxton or Dixon attempted to manufacture methamphetamine; and 2) Todd, with the purpose of promoting or furthering the commission of that attempt to manufacture methamphetamine, acted together with or aided Neel, W. Paxton or Dixon in committing that offense. *Wurtzberger,* 40 S.W.3d at 896; §§ 564.011 and 562.041.1(2); MAI–CR3d 304.04; MAI–CR3d 304.06.

Attempt to manufacture methamphetamine has two elements that the State must prove: 1) the defendant had the purpose of committing the underlying offense (manufacturing methamphetamine), and 2) the doing of an act which constitutes a

substantial step toward the commission of that offense. *West*, 21 S.W.3d at 64. A "substantial step" is an act that is "strongly corroborative of the firmness of the actor's intent to complete the commission of the offense." *Id.;* § 564.011.1. The conduct must be indicative of the defendant's purpose to complete the offense. *O'Brien*, 5 S.W.3d at 534. "The act or conduct that will fulfill the substantial step requirement depends on the facts of the particular case." *West*, 21 S.W.3d at 64. "A substantial step or overt act towards the commission of the crime must be something more than mere preparation, yet may be less than the last act necessary before the actual commission of the substantive crime." *O'Brien*, 5 S.W.3d at 534.

When Detective Carr and Deputy Connor stepped inside Dixon's trailer they noticed a solvent smell. After obtaining Dixon's consent to look around the trailer, several items used in the production of methamphetamine were found. A large glass container full of liquid and a "smoker" were found in the bathtub. A jar of muriatic acid was found under the bathroom sink. Coffee filters, a plastic baggy with a white powdery residue, and cups with residue were found. The residue found in the cups was methamphetamine and the powdery substance in the baggy was pseudoephedrine. Syringes, pillboxes, paper plates, coffee filters, foil blister packets from Sudafed pills, and battery wrappings were found in the trash. Another jar, a set of scales, a mirror and razor blades were found in a back bedroom. Rubber tubing and syringes were also found in the bedroom where Neel and Todd were discovered lying on the floor.

■ Dixon, as an alleged accomplice of Todd lived in the trailer where all these items were found. "Constructive possession requires, at a minimum, evidence that the defendant had access to and control over the premises where the materials were found." *Withrow*, 8 S.W.3d at 80. "Exclusive possession of the premises containing the materials raises an inference of possession and control." *Id.* Such is the case here since Dixon exclusively possessed the trailer. Further, there was ample incriminating evidence implying that she knew of the presence of the manufacturing process. *State v. Purlee*, 839 S.W.2d 584, 588 (Mo. banc 1992). Materials to manufacture methamphetamine and methamphetamine itself were found in various stages of production throughout Dixon's trailer. As she had exclusive possession of the trailer, it is impossible to say that she was unaware of the preparation and/or manufacturing of methamphetamine in the trailer or that the process was not under her control. There was sufficient evidence to find that Dixon, an accomplice of Todd, attempted to manufacture methamphetamine under Count XX.

### 3. Count XXI

In Count XXI of the information, Todd was charged with the Class D felony of unlawful use of drug paraphernalia, in that "the defendant acting together with La-Crista Neel, David W. Paxton, and Karen Dixon, possessed coffee filters, containers of anhydrous ammonia, rubber tubing, glassware, and a homemade 'smoker' for producing hydrogen chloride, with the intent to use the paraphernalia to manufacture and produce methamphetamine."

Section 195.233.1 states:

It is unlawful for any person to use, or to possess with intent to use, drug paraphernalia to plant, propagate, cultivate, grow, harvest, manufacture, compound, convert, produce, process, prepare, test, analyze, pack, repack, store, contain, conceal, inject, ingest, inhale, or otherwise introduce into the human body a controlled substance or an imitation con-

trolled substance in violation of sections 195.005 to 195.425.

To convict Todd of the unlawful use of drug paraphernalia under a theory of accomplice liability, the State was required to prove that: 1) Todd, Neel, W. Paxton or Dixon possessed coffee filters, containers of anhydrous ammonia, rubber tubing, glassware, and a homemade "smoker" for producing hydrogen chloride, with the intent to use the items to manufacture methamphetamine; and 2) with the purpose of promoting or furthering the commission of that possession of drug paraphernalia with intent to use, Todd acted together with or aided Neel, W. Paxton or Dixon in committing that offense. Section 562.041.1(2); MAI–CR3d 325.22; MAI–CR3d 304.04.

As stated *supra,* all of these items were found throughout Dixon's trailer that she exclusively possessed. "Exclusive possession of the premises containing the materials raises an inference of possession and control." *Withrow,* 8 S.W.3d at 80. The evidence was sufficient to convict Dixon, as an accomplice of Todd, of the unlawful use of drug paraphernalia under Count XXI.

### 4. Conclusion

The points related to Counts V, VI, VII and XIX are with merit and those convictions will be reversed outright. The portions of this point as to Counts XX and XXI are denied.

### II.

Todd argues in his second point that the trial court plainly erred in submitting Instructions 8, 14, 26, 28, 34, 36, and 42, based on MAI–CR3d 325.34 in that the verdict directors violated Notes on Use, Note 2, of MAI–CR3d 325.34 and § 195.420.1, because the instructions were not modified to instruct the jury to find that the charged chemicals, lithium and anhydrous ammonia, were precursor ingredients of methamphetamine, as neither of these charged chemicals is listed in § 195.400.

Under Rule 30.20, "[w]hether briefed or not, plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." The plain error rule should be used sparingly and does not justify a review of every point that has not been properly preserved for appellate review. *State v. Roberts,* 948 S.W.2d 577, 592 (Mo. banc 1997). Review of a claim of plain error is a two-step process. *State v. Hibler,* 21 S.W.3d 87, 96 (Mo.App.2000). The first step involves an examination to determine whether the claim for review "facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted.' " *State v. Brown,* 902 S.W.2d 278, 284 (Mo. banc 1995). "If plain error is found on the face of the claim, then the rule authorizes, as a matter of discretion, a second step to determine whether the claimed error resulted in manifest injustice or a miscarriage of justice." *Hibler,* 21 S.W.3d at 96. "The rule makes it clear that not all prejudicial error—that is, reversible error—can be deemed plain error." *Id.*

Instructional error seldom rises to the level of plain error. *Bradshaw,* 26 S.W.3d at 472. "To show that the trial court 'plainly erred' in submitting a jury instruction, a defendant 'must go beyond a demonstration of mere prejudice.' " *Id.* (quoting *State v. Cates,* 3 S.W.3d 369, 372 (Mo.App.1999)). With regard to instructional error, plain error results " 'when the trial court has so misdirected or failed to instruct the jury that it is apparent to the appellate court that the instructional error

affected the jury's verdict.' " *Hibler*, 21 S.W.3d at 96 (quoting *State v. Roe*, 6 S.W.3d 411, 415 (Mo.App.1999)). It is the defendant's burden to show that plain error has occurred. *Id.*

Rule 28.02(c) provides, "Whenever there is an MAI–CR instruction or verdict form applicable under the law and Notes On Use, the MAI–CR instruction or verdict form shall be given or used to the exclusion of any other instruction or verdict form." Further, under Rule 28.02(f), "The giving or failure to give an instruction or verdict form in violation of this Rule 28.02 or any applicable Notes On Use shall constitute error, the error's prejudicial effect to be judicially determined."

Here, Todd was charged with seven counts of creation of a controlled substance, § 195.420. Section 195.420.1 provides, in pertinent part that "[i]t is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400, or reagents, or solvents, or *any other chemicals proven to be precursor ingredients of methamphetamine or amphetamine, as established by expert testimony* .... with the intent to manufacture .... a controlled substance. ....." (emphasis added).

In this case, Instructions 8, 14, 26, 28, 34, 36 and 42 read, in pertinent part:

As to Count [ ], if you find and believe from the evidence beyond a reasonable doubt:

First, that on [relevant date], in the County of Pettis, State of Missouri, the defendant possessed [lithium or anhydrous ammonia], and

Second, that the defendant knew or was aware of its presence and nature, and

Third, that the defendant did so with the intent to process the [lithium or anhydrous ammonia] to create methamphetamine, a controlled substance,

then you will find the defendant guilty under Count [ ] of possession of a chemical with the intent to create a controlled substance.

These instructions follow MAI–CR3d 325.34, the pattern instruction for § 195.420. Note on Use 2 to MAI–CR3d 325.34, however, states:

2. Section 195.420.1 also prohibits the possession of "reagents or solvents, or any other chemical proven to be precursor ingredients of methamphetamine or amphetamine, as established by expert testimony pursuant to subsection 3 of this section" with the intent to create a controlled substance or a controlled substance analogue. To instruct on the possession of these substances, modify this instruction accordingly.

As lithium and anhydrous ammonia are not listed in § 195.400, it appears that Note on Use 2 to MAI–CR3d 325.34 required the instructions to have been modified accordingly. Todd's attorney did not object to Instructions 8, 14, 26, 28, 34, 36 and 42 on this basis or raise the issue in his motion for new trial. Thus, Todd requests plain error review.

The State argues that there was no dispute at trial that lithium and anhydrous ammonia were not "precursor ingredients" of methamphetamine. "[I]f an element is not disputed at trial, the failure to correctly instruct the jury on that element does not result in manifest injustice requiring reversal." *Bradshaw*, 26 S.W.3d at 473. A review of the record in this case indicates that there was no dispute at trial that lithium and anhydrous ammonia were "precursor ingredients" of methamphetamine. In fact, during Deputy Carr's cross-examination, he stated that both anhydrous ammonia and lithium were precursors of methamphetamine. Point denied.

## III.

Todd argues in his third point that the trial court plainly erred in overruling his motions for judgment of acquittal and in sentencing him upon his convictions for creation of a controlled substance under Counts II, V, XI, XII, XV and XIX in that § 195.420 fails to give a person of ordinary intelligence fair notice that his contemplated conduct is forbidden, and is, therefore, unconstitutionally vague. Todd raised this issue for the first time on appeal. This same argument was rejected in *State v. Condict,* 65 S.W.3d 6, 10 (Mo.App.S.D. 2001). This argument is moot as to Counts V and XIX by reason of the court's decision in Point I., *supra.* This court declines to review the remaining counts for plain error. Point denied.

## IV.

Todd argues in his fourth point that the trial court plainly erred in sentencing him on the counts for possession of pseudoephedrine with intent to manufacture methamphetamine, creation of a controlled substance, and unlawful use of drug paraphernalia, as it violated his right to be free from double jeopardy, in that the counts of attempted manufacture of methamphetamine were a continuing course of conduct prosecuted in separate parts in the counts of possession of pseudoephedrine with intent to manufacture methamphetamine, creation of a controlled substance by possessing lithium and anhydrous ammonia with intent to manufacture methamphetamine, and unlawful use of drug paraphernalia with intent to manufacture methamphetamine.

■ Todd asks this court to review his claim for plain error. Here, however, Todd's claim has been waived. "This is because a claim of double jeopardy is a personal privilege that is waived if not raised at the proper time." *State v. Dunn,* 7 S.W.3d 427, 430 (Mo.App.1999). Further, the exception noted in *State v. Elliott,* 987 S.W.2d 418, 421 (Mo.App.1999) (plain error is proper to determine double jeopardy challenges in cases where it can be determined from the face of the record that the court had no power to enter the conviction), is not present in this case. *Id.* This court declines plain error review of this point.

## V.

Todd argues in his fifth point that the trial court erred in overruling his motions for judgment of acquittal and in sentencing him upon his convictions for Counts II, V, XI, XII, XV, XVI and XIX, for creation of a controlled substance, because the State did not prove these offenses beyond a reasonable doubt in that neither lithium nor anhydrous ammonia is a substance specifically proscribed by § 195.420 since it is not a chemical listed in § 195.400.2, nor is lithium or anhydrous ammonia an "immediate precursor" of methamphetamine, as defined in § 195.010(20).[2]

■ Todd did not present this argument in his motion for new trial; therefore, this court's review is for plain error. *State v. Ringo,* 30 S.W.3d 811, 821 (Mo. banc 2000). "[U]nless a claim of plain error facially establishes substantial grounds for believing that 'manifest injustice or miscarriage of justice has resulted,' this Court will decline to exercise its discretion to review for plain error under Rule 30.20." *Brown,* 902 S.W.2d at 284.

Section 195.420 states:

---

**2.** As noted in the discussion under Point III, the convictions on Counts V and XIX are reversed.

1. It is unlawful for any person to possess chemicals listed in subsection 2 of section 195.400, or reagents, or solvents, or any other chemicals proven to be *precursor ingredients* of methamphetamine or amphetamine, as established by expert testimony pursuant to subsection 3 of this section, with the intent to manufacture, compound, convert, produce, process, prepare, test, or otherwise alter that chemical to create a controlled substance or a controlled substance analogue in violation of sections 195.005 to 195.425.

2. A person who violates this section is guilty of a class C felony.

3. The state may present expert testimony to provide a prima facie case that any chemical, whether or not listed in subsection 2 of section 195.400, is an *immediate precursor ingredient* for producing methamphetamine or amphetamine.

(emphasis added).

The issue here is whether the legislature intended in § 195.420 to criminalize possession of chemicals proven by experts to "precursor ingredients" of methamphetamine (when possessed with the intent to manufacture a controlled substance), or to criminalize possession of only those chemicals proven by expert testimony to be "immediate precursors" of methamphetamine as that phrase is defined in § 195.010(20).[3] This issue was squarely addressed in *Condict,* at 10.

In *Condict,* the Southern District considered the history of § 195.420, the surrounding circumstances, and "examine[d]

the problem in society to which the legislature addressed itself." at 12 (quoting *State v. Haskins,* 950 S.W.2d 613, 616 (Mo.App. 1997)). After a thorough analysis, the court in *Condict* determined that "the legislature intended by its 1998 amendment of § 195.420 to expand the criminalization of methamphetamine and amphetamine precursors beyond what is defined as 'immediate precursors.' " at 14. The court found that the legislature did not intend § 195.420.3 "to require the state to present expert testimony that a chemical was an 'immediate' precursor as the only means of making a prima facie case under § 195.420." at 14. "[T]o the contrary, the legislature intended to authorize the state, via expert testimony, to make a prima facie case that any chemical, whether or not listed in § 195.400.2, was a component of or may be used to produce a controlled substance. *Id.* Based on its analysis, the court in *Condict* held that the State's only burden under § 195.420.3 was to prove by expert testimony that lithium was a component of or was used to produce methamphetamine." *Id.*

■■■ In the present case, Karen Schell (Schell), a drug chemist for the Missouri State Highway Patrol, testified for the State. Schell testified that she produced methamphetamine as a research project for her Master's degree in applied chemistry utilizing the "lithium/anhydrous ammonia method." Schell also testified that the lithium/anhydrous ammonia process is sometimes referred to as a cold process. Further, the State had Schell look at State's Exhibit 2, which was a procedure

---

**3.** Section 195.010(20) defines an "immediate precursor" as a substance that:

(a) The state department of health has found to be and by rule designates as being the principal compound commonly used or produced primarily for use in the manufacture of a controlled substance;

(b) Is an immediate chemical intermediary used or likely to be used in the manufacture of a controlled substance, and

(c) The control of which is necessary to prevent, curtail or limit the manufacture of the controlled substance[.]

for manufacturing methamphetamine.[4] The procedure listed lithium and ammonia as main ingredients. Schell testified that a person would be able to create methamphetamine following the procedure indicated in State's Exhibit 2. Based on Schell's testimony and in light of *Condict*, Todd's argument does not facially establish substantial grounds for believing that manifest injustice or miscarriage of justice has resulted. Point V is denied.

### Conclusion

The judgment is only reversed on Counts V, VI, VII and XIX, and is in all other respects affirmed. The case is remanded with instructions to enter a new judgment in accordance with this opinion.

All concur.

---

4. Exhibit 2 states: "Procedure: 1. Crush pseudoephedrine pills; 2. Peel batteries to get lithium; 3. Combine pills, lithium, ammonia; 4. Stir allow ammonia to evaporate; 5. Add Toluol/Toulene; 6. Strain out solids, leaving liquid; 7. Combine salt and acid in smoker; 8. Pump smoke through liquid; 9. Filter meth from liquid; 10. Scrape meth from filters; Repeat steps 8,9,10."