[No. B043518. Second Dist., Div. Five. Jan. 11, 1991.]

THE PEOPLE, Plaintiff and Respondent, v.
WILLIAM GRANT ODOM III, Defendant and Appellant.

**[Opinion certified for partial publication.\*]**

---

\* Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of section I.

---

**COUNSEL**

Lorraine L. Loder, under appointment by the Court of Appeal, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Richard B. Iglehart, Chief Assistant Attorney General, Edward T. Fogel, Jr., Assistant Attorney General, William T. Harter and Donald J. Oeser, Deputy Attorneys General, for Plaintiff and Respondent.

---

**OPINION**

ASHBY, J.—A jury determined appellant William Grant Odom III possessed three stolen weapons (Pen. Code, § 496, subd. (1)), possessed precursors with intent to manufacture methamphetamine (Health and Saf. Code, § 11383, subd. (c)(1)), and endangered two children (Pen. Code, § 273a, subd. (1)). On appeal, appellant argues the charges were improperly joined and the evidence was insufficient to support the felony child endangerment convictions.

In section I, the unpublished portion of this opinion, we hold the charges were properly joined. In the published portion of this opinion, section II, we hold there were substantial facts to support the felony child endangerment convictions.

FACTS

The convictions relate to incidents occurring on two different dates. The facts are summarized and additional facts discussed if relevant to the issues presented.

On September 29, 1988, appellant was stopped by officers for driving a paneled van in a residential area at an excessive speed. In a lawful search the officers discovered, among other items, a semi-automatic assault weapon which was a replica of an AK47, a loaded "banana clip" (a magazine which holds bullets), three bottles of hydriodic acid, one can of red phosphorous,

two cylinders of hydrogen chloride, four gallon bottles of freon, respirators, one bottle of iodine crystals, and boxes containing substantial amounts of glassware utilized in manufacturing methamphetamine (e.g., glass beakers, stirring rods, etc.). Ephedrine was also present. Appellant was arrested and charged with possession of precursors with intent to manufacture methamphetamine. Subsequently, he was released on bail.

Approximately four months later, on January 27, 1989, police officers lawfully searched appellant's home located in Long Beach, California. The items found in and around his home and its condition led to appellant being charged on three counts of possessing stolen property and two counts of child endangerment involving appellant's two children (ages nine and seven). In the search, the officers discovered twelve guns, three of which had been stolen, and at least three of which were loaded.[1] In and around the home were substantial quantities of chemicals, glassware, and other apparatus utilized in the manufacture of methamphetamine.[2]

The home posed serious dangers to all inhabitants. The chemicals were inherently dangerous and improperly stored. Illegal electrical wiring existed in the home, including wires simply strung down the walls. Feces from two adult dogs (a pit bull and another large dog) and numerous puppies were all over the home.[3] There were holes in the roof, one with exhaust tubing directly beneath. Charred rafters were simply covered with plywood or plastic sheeting. Steps outside one door were hazardous, consisting of loose concrete blocks. Some bars on the windows had no safety releases. There was no food in the kitchen cupboards and the kitchen sink was inoperable because the pipes leading from the drain had been eaten away when chemical waste was washed down the sink. There was spoiled food and trash in and around the kitchen.

Appellant took the stand in his own defense. He denied knowing about the items found in the van and accused the police of destroying his home and making it appear not habitable.

---

[1] The three stolen weapons found on the premises were: a .22-caliber Ruger steel pistol stolen on December 24, 1988; a .22-caliber Marlin rifle discovered missing in July 1988; and a .357 magnum Ruger Blackhawk handgun taken sometime in April 1988.

[2] The chemicals found in and around the home included: potassium iodide, ephedrine, xylene, sulfuric acid, six bottles of hydriodic acid, five bottles of freon, one five-gallon can of freon, muriatic acid, iodine crystals, 2-propanol, red phosphorus, two cylinders of hydrogen chloride gas, and one bottle of hydrochloric acid. Other drug paraphernalia included a triple beam scale, a deep fryer cooker, a heat control device, a venting device, a respirator, glass stirring rods, glass beakers and bottles, and plastic jugs.

[3] Four snakes were also in the home: a red toe boa, a Colombian red toe boa, a Burmese rock python, and a bald python.

DISCUSSION

I.*

.   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .   .

II

Appellant contends there was no substantial evidence to support the felony child endangerment convictions pursuant to Penal Code section 273a subdivision (1).[5] Appellant's contention is not persuasive.

■   Felony child abuse pursuant to Penal Code section 273a, subdivision (1) "can occur in a wide variety of situations: the definition broadly includes both active and passive conduct, i.e., child abuse by direct assault and child endangering by extreme neglect. Two threshold considerations, however, govern all types of conduct prohibited by this law: first, the conduct must be willful; second, it must be committed 'under circumstances or conditions likely to produce great bodily harm or death.' (§ 273a, subd. (1).) Absent either of these elements, there can be no violation of the statute." (*People v. Smith* (1984) 35 Cal.3d 798, 806 [201 Cal.Rptr. 311, 678 P.2d 886].)

"Willful" does not require a specific intent to violate the law or to injure another. Rather, it requires a purpose or willingness to commit the act or make the omission. (*People v. Pointer* (1984) 151 Cal.App.3d 1128, 1134 [199 Cal.Rptr. 357]; *People v. Sheffield* (1985) 168 Cal.App.3d 158, 165 and fn. 8 [214 Cal.Rptr. 40].) The degree of culpability required by the statute has been determined to require "criminal negligence in the commission of an offending act." (*Walker v. Superior Court* (1988) 47 Cal.3d 112, 135 [253 Cal.Rptr. 1, 763 P.2d 852]; *People v. Peabody* (1975) 46 Cal.App.3d 43, 48-49 [119 Cal.Rptr. 780].) Criminal negligence "means that the defendant's conduct must amount to a reckless, gross or culpable departure from the ordinary standard of due care; it must be such a departure from what would be the conduct of an ordinarily prudent person under the same circumstances as to be incompatible with a proper regard for human life." (*Ibid.*)

---

*See footnote, *ante,* page 1028.

[5] Penal Code section 273a, subdivision (1) states: "Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of such child to be injured, or willfully causes or permits such child to be placed in such situation that its person or health is endangered, is punishable by imprisonment in the county jail not exceeding one year, or in the state prison for 2, 4, or 6 years."

■ Penal code section 273a, subdivision (1) is intended to protect children from situations in which the "probability of serious injury is great." (*People* v. *Jaramillo* (1979) 98 Cal.App.3d 830, 835 [159 Cal.Rptr. 771].) The risk need not be life threatening, as long as there are risks of great bodily harm. (*People* v. *Caffero* (1989) 207 Cal.App.3d 678, 683-684 [255 Cal.Rptr. 22].) One can be criminally culpable for violating the statute through a course of conduct as well as by a specific act. (*People* v. *Sheffield*, *supra*, 168 Cal.App.3d at p. 167; *People* v. *Ewing* (1977) 72 Cal.App.3d 714, 717 [140 Cal.Rptr. 299].) Further, "[f]or the felony punishment there is no requirement that the actual result be great bodily injury." (*People* v. *Jaramillo*, *supra*, 98 Cal.App.3d at p. 835; *People* v. *Hernandez* (1980) 111 Cal.App.3d 888, 895 [168 Cal.Rptr. 898].)

■ Here, the record is replete with evidence demonstrating that the condition of appellant's home created a situation in which there was a great probability appellant's two children, ages nine and seven, would incur serious injury. The extensive, uncontradicted expert testimony discussing the totality of circumstances demonstrated appellant endangered his children.

First, the home, described by one witness as "deplorable," was unsanitary. (E.g., *People* v. *Harris* (1966) 239 Cal.App.2d 393 [48 Cal.Rptr. 677] [extremely filthy residence and unsanitary condition in home constitute child endangerment].) Dog feces were throughout the home.[6] The pipes from the kitchen sink were eaten away from the dumping of hazardous chemicals through the sink; a bucket under the sink caught and retained waste. Spoiled food remnants and unwashed dishes were scattered all over the kitchen, on top of the stove and overflowing from trash cans. While there was no evidence the children suffered from malnutrition, it is clear their dietary needs were not foremost in appellant's mind as no food was seen in the cupboards. At least one of the beds had no sheets. Further, there was a hole in the roof which potentially could produce unsafe living quarters.

Other conditions in the home also created potential perils. There is no indication the children were prevented access to the 12 weapons, at least 3 of which were loaded. Bars on the windows lacked safety releases; the steps leading from the rear of the home were loose, unsecured bricks; the large quantity of furniture and personal belongings inside made it difficult to maneuver in the home. Thus, if an emergency such as a fire required a quick escape, it would have been difficult, if not impossible for the children to leave.

Further, the chemicals and their method of storage in and around appellant's home were a disaster waiting to happen. Although appellant was not

---

[6]Two adult dogs, including an adult pit bull, and numerous puppies were not contained in a confined area.

charged with possessing precursors to manufacture methamphetamine in his home, all evidence indicated the home was either being used as a clandestine manufacturing plant or appellant stored the items necessary to manufacture methamphetamine but production occurred at another location. In that a venting device was found near an opening in the ceiling, it would have been reasonable for the jury to conclude methamphetamine was manufactured on site. As expert testimony indicated, if the actual manufacturing was occurring in the home, at every step in the production volatile and dangerous solvent vapors would be produced. Throughout the manufacturing process, acid gases would be generated and sometime a byproduct called phosphine gas produced. This toxic and flammable gas has such profound effects that in World War I it was utilized as a nerve gas. Later, the phosphorous itself can become overheated, change form, and become an incendiary product. Because the manufacturing process is so highly dangerous, explosions are not unusual.

Further, even if the home was not a clandestine methamphetamine manufacturing plant, the storing of the numerous chemicals at appellant's home posed inherent dangers. The hydriodic acid was stored without special precautions being taken even though this chemical is so dangerous the hazardous waste laws require a special permit for it to be moved. This corrosive mineral acid, in a liquid state, has a tendency to rapidly release noxious acid gases which can immediately cause second or third degree burns to the skin, and extreme pain and even death if inhaled. The chemical was stored without proper venting; in addition, the container's shape was such that spills would be likely if it were rocked or bumped. The sulfuric acid is a strong corrosive mineral acid. The inherent nature of the hydrogen chloride, hydrochloric acid and hydriodic acid, all mineral acids, require proper storage to be in acid vaults or at the very least, in a temperature-controlled environment. The hydrogen chloride gas can cause blindness or death if mishandled. Other chemicals which naturally released noxious, poisonous gases, were stored in containers insufficient to seal off the vapors and inadequate to prevent their release into the air. For example, freon evaporates slowly producing a narcotic effect which could asphyxiate individuals if gases build up.

Impending disaster and the likelihood of serious bodily harm were also created by the electrical wiring due to the potential of electrical shock and fires created from sparks. Wires in the home were jerryrigged and left exposed. The electrical meter box was altered and wiring left on the surface of the wall rather than protected and placed behind a wall. In one room, wires were simply strung down the wall from the ceiling to a switch. Other exposed wires were strung to a light fixture, and plastic sheeting was draped

over the fixture. In another room, anyone could easily pull apart the wiring as the spliced wires in a joint were exposed.

The charring in the rafters indicated that at least one fire already occurred in the home. Another fire was likely. Because the wiring was exposed, sparks would not have been unusual. A spark from turning on the light would have been sufficient to cause a fire or a fireball. Given that gases were being released continually from the chemicals, a spark would have been sufficient to detonate the gases and cause an explosion. Other risks of explosions and fires also existed. The phosphine is so flammable that if it were overheated and overconcentrated it would ignite. The flashpoints of some of the chemicals (temperatures at which chemicals burn) were such that because they were improperly stored, explosions were possible. Xylene is not only extremely flammable, but is possibly a carcinogen. This chemical, stored in the yard at the home, should have been stored in a temperature-controlled environment. The muriatic acid, a flammable liquid, would eventually have leaked from its plastic container. Two-propanol is also a flammable item.

Further, because of the amount and types of chemicals being stored at the home, had a fire occurred, it would have been very hot and would have spread rapidly.

Appellant suggests his two children were not in danger because there were numerous adults on the premises to supervise them. However, there is no indication the children were controlled or restricted in any way. It is more likely it would have been impossible to protect the children, ages nine and seven, from their own natural curiosity which would lead them to direct contact with the wires, guns, dogs and chemicals. Further, in that the dangers permeated the home, whether it be due to the health hazards created by the lack of sanitation, the dangers from the loaded weapons, the potentials from fire and explosions, the dangerous vapors, or the lack of a safe exit, it is difficult to understand how the children would have been protected even if their movements were severely monitored.

We also disagree with appellant's suggestion that the situation was only temporary and thus not sufficiently dangerous to create the likelihood of great bodily injury. The dangers created in the home were so hazardous that, even if we believed appellant's suggestion (which we question), the existence of the hazards even for a short time sufficiently endangered the well-being of the children to be a violation of Penal Code section 273a, subdivision (1).

The judgment is affirmed.

Lucas, P. J.,* and Turner, J., concurred.

---

* Retired Presiding Justice of the Court of Appeal sitting under assignment by the Chairperson of the Judicial Council.