**STATE of Missouri, Plaintiff/Respondent,**

**v.**

**Kari Lynn KUHN, Defendant/Appellant.**

**No. ED 81558.**

Missouri Court of Appeals, Eastern District, Division Four.

July 8, 2003.

Motion for Rehearing and/or Transfer to Supreme Court Denied Sept. 24, 2003.

Application for Transfer Denied Oct. 28, 2003.

Frank Kimberly Carlson, Carlson Law Firm, Union, MO, for Appellant.

John Munson Morris III, Dora A. Fichter, Attorney General's Office, Jefferson City, MO, for Respondent.

## Introduction

SHERRI B. SULLIVAN, Judge.

Kari Lynn Kuhn (Appellant) appeals from a judgment of conviction of endangering the welfare of a child in the first degree, a Class D felony in violation of Section 568.045.[1] Appellant alleges that the trial court erred in overruling her motion for judgment of acquittal and her motion for judgment notwithstanding the verdict because the evidence at trial was insufficient to support her conviction. We reverse.

## Procedural Background

On April 1, 2002, Appellant was tried before a jury on charges of possession of methamphetamine, possession of ephedrine with intent to manufacture methamphetamine, attempt to manufac-

---

1. All statutory references are to RSMo. (2000), unless otherwise indicated.

ture methamphetamine, and endangering the welfare of a child in the first degree. At the close of all evidence, the jury acquitted Appellant of the charges of possession of methamphetamine, possession of ephedrine with intent to manufacture methamphetamine and attempt to manufacture methamphetamine, and convicted her of endangering the welfare of a child in the first degree. The court sentenced Appellant to two years in the Missouri Department of Corrections. This appeal follows.

*Factual Background*

Viewed in the light most favorable to the verdict, the evidence presented at trial established the following relevant facts. On the night of January 12, 1999, Corporal Patton (Patton) with the Missouri Highway Patrol stopped a vehicle driven by David Clawson (Clawson) for speeding. Patton asked Clawson for his driver's license, which Clawson denied having with him. Patton noticed Clawson's wallet in his pocket, and asked him to produce it. Clawson did, and Patton retrieved Clawson's driver's license from it. Patton ran Clawson's driver's license on the radio, and learned that Clawson's license was suspended, and that Clawson was on probation for criminal convictions. Clawson's eyes appeared bloodshot and glassy, and his hands were shaking. Patton asked Clawson if he had any drugs on his person. Clawson said he did not. Patton then found some marijuana on Clawson's person, and Clawson admitted to smoking marijuana at a friend's house but said that he had forgotten about the remainder of marijuana he had on him. Clawson then told Patton that there was methamphetamine in the house where he had partied. Clawson agreed to take Patton to the house if Patton would agree not to file any charges against Clawson. Clawson directed Patton to a trailer owned by Appellant on Corral Lane in Villa Ridge. Patton then dropped Clawson off at a gas station and returned to the trailer where he met with other officers he had called for back up.

Patton knocked on the door of Appellant's trailer. Appellant asked who it was, and answered the door after Patton informed her he was a highway patrolman. Appellant, who was holding her two-year-old son, opened the front door just enough so that she could exit. Patton testified that as Appellant opened the door he smelled a strong odor of chemicals commonly used to manufacture methamphetamine. Patton also testified that Appellant's eyes were glassy, that she was swaying, and that her speech was slurred. Patton requested that they go inside. Appellant refused and said that they could continue their conversation on the porch. Patton told Appellant that he had been informed that there was methamphetamine in the house and that he could smell the chemicals and asked to go inside. Appellant stated that there was no methamphetamine in her house, that Patton did not smell any chemicals and refused to let Patton inside. At this time, Patton placed Appellant under arrest for endangering the welfare of a child. At Appellant's request, her son was placed with a neighbor friend and Appellant was transported to the Franklin County Detention Center.

Corporals Miesner (Miesner) and Burckhardt (Burckhardt) monitored Appellant's trailer while Patton obtained a search warrant. No one arrived at Appellant's trailer while Miesner and Burckhardt were waiting. Patton returned with a search warrant and they all entered Appellant's trailer.

In the trailer, the officers smelled the strong odor of chemicals associated with the production of methamphetamine.

They made a protective sweep looking for people and dangerous equipment requiring protective gear. They found neither.

The trailer was in terrible disarray, appearing to be ransacked, with furniture gone, trash and clothes strewn about, the water shut off and the toilet backed up, smelling of sewage. Patton testified that it was uninhabitable.

The search of Appellant's trailer revealed the following items, all in the kitchen: numerous pseudoephedrine tablets, a large amount of white powdery substance, a cordless drill with ephedrine pills stuck on its blade, starting fluids, two one-gallon jugs with chemicals, a one-gallon jug with clear liquid with the odor of denatured ethanol, numerous coffee filters, lithium batteries, funnels, plastic tubing, "rig" kits, which are small black plastic bags containing syringes and cotton balls, two electric scales, several issues of the marijuana magazine named "High Times," and two weapons on the kitchen counter. Everything necessary for the production of methamphetamine was present in Appellant's residence, except for anhydrous ammonia and either muriatic or sulfuric acid. The laboratory analysis of the items revealed that there were a total of 613.22 grams of pseudoephedrine in a powder form and 0.2 grams of methamphetamine, which was contained in a rig kit.

After the search, Patton spoke with Appellant in jail. He testified that he noticed that Appellant had some track marks from needles on her arms and asked her how long she had been using methamphetamine. Patton testified that Appellant replied: "Not very long."

Subsequently, Appellant was charged with possession of methamphetamine, possession of ephedrine with intent to manufacture methamphetamine, attempt to manufacture methamphetamine, and endangering the welfare of a child in the first degree.

Appellant testified at trial. She claimed that she had previously lived in the trailer, but that she had moved out with her son six weeks or a month prior to the search because she did not like the people with whom her son's father was associating, and that Appellant and her son had been living in a motel. According to Appellant, on the night of January 12, she saw on the evening news that there was going to be a freezing rain and decided to go to the trailer to pick up her belongings. Appellant claimed that she found the trailer "ransacked," that she became angry with Clawson, whom she found in the trailer, and that she threw him out. According to Appellant, there were so many items scattered throughout the trailer that she did not even notice the State's evidence. Appellant claimed that even if she had noticed the evidence, she would not have known that these items were used in the production of methamphetamine. Appellant denied knowing that methamphetamine was manufactured in the trailer and denied possessing methamphetamine. Appellant stated that she did not let Patton inside because she was embarrassed by the trailer's condition and from the odor of what she thought was sewage. Appellant claimed that she never told Patton that she lived in the trailer and that she tried to explain to him that she was there only to pick up some items, but that Patton did not want to listen to her. Appellant also denied telling Patton that she was using methamphetamine and exhibited her arms to the jury to show that she had no needle marks at the time of trial.

Appellant also called the parents of her son's father who testified that they saw Appellant on the day of her release from jail and that they did not see any needle marks on Appellant's arms. They also

testified that they had picked up Appellant's son on occasion from the motel where Appellant and her son were staying. A frequent visitor to Appellant's next-door neighbor testified that Appellant's trailer appeared to be vacant in the weeks or months prior to January 13. In rebuttal, the state recalled Patton who testified that Appellant had told him that she lived in the trailer.

## Point on Appeal

In her only point on appeal Appellant argues that the trial court erred in overruling her motion for judgment of acquittal and her motion for judgment notwithstanding the verdict because there was insufficient evidence to support a finding that Appellant's son's presence at the mobile home presented an actual risk to him. Appellant also argues that there was no evidence that Appellant knew her son's presence at the mobile home was practically certain to create an actual harm to him.

## Standard of Review

In reviewing a challenge to the sufficiency of the evidence supporting a criminal conviction, we do not weigh the evidence or credibility of the witnesses, but rather, we determine whether there is sufficient evidence from which a reasonable trier of fact might have found the appellant guilty beyond a reasonable doubt. *State v. Shinn*, 921 S.W.2d 70, 72–73 (Mo.App. E.D.1996). The evidence, including reasonable inferences therefrom, is viewed in the light most favorable to the verdict, and all evidence and inferences to the contrary are disregarded. *Id.* at 72. The trier of fact determines the credibility of a witness. *Id.* at 73. The trier of fact may believe all, some or none of the testimony of a witness when considered with all of the facts, circumstances and other testimony in the case. *Id.*

## Discussion

 Section 568.045 provides in relevant part:

A person commits the crime of endangering the welfare of a child in the first degree if:

(1) The person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old.

There is no bright line test to determine whether or not a person's actions knowingly create a substantial risk to the health of a child. *State v. Hunter*, 939 S.W.2d 542, 545 (Mo.App. E.D.1997). In determining whether actions rise to this level, we look at the totality of the circumstances as presented by the evidence. *Id.* The issue boils down to a determination as to whether there was evidence from which reasonable persons could have found the accused guilty of this charge. *State v. Riggs*, 2 S.W.3d 867, 869 (Mo.App. W.D.1999). The mental elements of the defendant's knowledge may be proven by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident. *Id.* The statute does not require severe injuries that endanger a child's welfare, but rather that the act of the defendant herself creates a substantial risk of harm. *State v. Miller*, 985 S.W.2d 857, 858 (Mo. App. E.D.1998).

Respondent notes in its brief that there are no Missouri cases discussing the risks of harm to a young child from coming in contact with chemicals and artifacts commonly used in the production of methamphetamine. However, Respondent cites *People v. Odom*, 226 Cal.App.3d 1028, 277 Cal.Rptr. 265 (Cal.App.1991), in support of its contention that "even the temporary presence of a child on the premises where chemicals used for production of methamphetamine were stored, created a risk for

great bodily harm." The situation in *Odom* is drastically different from that in the instant case. In *Odom,* the appellant actually lived day to day with his children, ages seven and nine, in the home. The court found that chemicals discovered in the home were inherently dangerous and improperly stored. *Id.* at 1031, 277 Cal. Rptr. 265. The court stated that "the chemicals and their method of storage in and around appellant's home were a disaster waiting to happen." *Id.* at 1033, 277 Cal.Rptr. 265. The chemicals found in and around the home included: potassium iodine, ephedrine, xylene, sulfuric acid, six bottles of hydriodic acid, five bottles of freon, one five-gallon can of freon, muriatic acid, iodine crystals, 2–propanol, red phosphorus, two cylinders of hydrogen chloride gas, and one bottle of hydrochloric acid. *Id.* at 1031, 277 Cal.Rptr. 265. The court found that the home posed serious dangers to all inhabitants. *Id.* Further, the *Odom* court found that: [2]

> [T]he record is replete with evidence demonstrating that the condition of appellant's home created a situation in which there was a great probability appellant's two children, ages nine and seven, would incur serious injury. The extensive, uncontradicted expert testimony discussing the totality of circumstances demonstrated appellant endangered his children.

*Id.* The expert testimony established the following:

> [I]f the actual manufacturing was occurring in the home, at every step in the production volatile and dangerous solvent vapors would be produced. Throughout the manufacturing process, acid gases would be generated and sometime a byproduct called phosphine gas produced. This toxic and flammable gas has such profound effects that in

World War I it was utilized as a nerve gas. Later, the phosphorous itself can become overheated, change form, and become an incendiary product. Because the manufacturing process is so highly dangerous, explosions are not unusual.

> Further, even if the home was not a clandestine methamphetamine manufacturing plant, the storing of the numerous chemicals at appellant's home posed inherent dangers ... The inherent nature of the hydrogen chloride, hydrochloric acid and hydriodic acid, all mineral acids, require proper storage to be in acid vaults or at the very least, in a temperature-controlled environment ... Other chemicals which naturally released noxious, poisonous gases, were stored in containers insufficient to seal off the vapors and inadequate to prevent their release into the air.

*Id.* at 1034, 277 Cal.Rptr. 265.

In the instant case, no anhydrous ammonia, muriatic acid, sulfuric acid, or any of the other volatile chemicals found in the *Odom* case were found in the trailer. The situation present in *Odom* is incomparable to that in the instant case, and thus we find it unpersuasive.

■ We do not believe that a reasonable trier of fact could have found that Appellant's son was under an actual risk of harm by merely being present in the mobile home where no dangerous equipment was found and no dangerous fume producing elements used in the manufacture of methamphetamine were found.

There was no evidence presented as to how the presence of the items found in the kitchen posed an actual danger to Appellant's son, when Appellant testified that she and her son were not in the kitchen. No one testified that Appellant's son was

---

**2.** Because Respondent relies so heavily on *Odom,* we quote from it liberally.

present in the kitchen where these items were found, or that he had access to any of these items. Compare, *State v. Sage,* 977 S.W.2d 65, 67 (Mo.App. W.D.1998) (Court made specific findings that bucket of knives on floor was in reach of child; that bottle of liquor on chair was in reach of child; water was not within child's reach). In fact, the only testimony as to the location of Appellant's son during their presence in the trailer was that of Appellant. Appellant testified that her son was in his car seat while she looked for the belongings for which she came to the trailer. Even if the jury chose to disbelieve Appellant's testimony, there was no evidence that her son had access to any of the items in the kitchen. Further, there was no evidence as to whether any of the items were found lying out in the open, scattered among the rubble in the kitchen or hidden in cabinets or in boxes. Such evidence of access is crucial in this case because the purported danger to Appellant's son could not have come from any fume, gas, vapor or fire producing items, as amply demonstrated in *Odom,* because there were no such items present.[3] Rather, Appellant's son would have had to have access to the items to create any actual harm, as with the bucket of knives in *Sage.*

■ The record does not establish that the items found in the trailer's kitchen presented a substantial risk to Appellant's son. The criminal statutes for child endangerment are meant to apply to situations where a person creates an actual or practically certain risk to the life, body, or health of a child, *Carmons v. State,* 26 S.W.3d 382, 385 (Mo.App. W.D.2000), as was the case in *Odom.* They are not meant to apply to situations where there is only

the potential for risk to the health of the child. *Id.*

We find that there was not sufficient evidence in the instant case from which a reasonable trier of fact might have found that the items found in the trailer's kitchen rose to the level of endangering the welfare of Appellant's son in the first degree. See, e.g., *Hunter,* 939 S.W.2d at 545 (Although finding it reprehensible, we did not find that forcing the child to drink a small glass of beer did not, in and of itself, create a substantial risk to her health, and without further evidence, did not rise to the level of endangering the welfare of a child in the first degree.).

■ We also question whether the jury could have found beyond a reasonable doubt that Appellant had knowledge of the presence of the items used in the manufacture of methamphetamine. Instruction No. 11 provided in pertinent part:

As to Count IV, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about January 13, 1999, in the County of Franklin, State of Missouri, the defendant *had a child in a home in which methamphetamine was attempted to be manufactured,* and

Second, that in so doing, the defendant created a substantial risk to the life or body or health of Kevin Robert Beck, and

Third, that Kevin Robert Beck was then less than seventeen years old, and

Fourth, that defendant *acted knowingly with respect to the facts and circumstances submitted in this instruction,*

is not a basis for a charge of child endangerment in the first degree.

---

**3.** When making this point, we note that starter fluid is a common household item. Its mere presence in the kitchen, without more,

Then you will find the defendant guilty under Count IV of endangering the welfare of a child in the first degree.

(Emphasis added).

Appellant testified that she did not have such knowledge, but issues of credibility of a witness are for the jury and we will not reweigh issues of credibility. *Shinn*, 921 S.W.2d at 72–73. However, we note that when a person is present on premises where drugs are found but does not have exclusive use or possession of the premises, it may not be inferred that he had knowledge of the presence of the drugs or had control, so that no submissible case is made. *State v. Todd*, 70 S.W.3d 509, 521 (Mo.App. W.D.2002). Additional factors are required and the totality of the circumstances should be considered in determining whether sufficient additional incriminating circumstances have been proved. *Id.* Because the jury acquitted Appellant on the charges of possession of methamphetamine and possession of ephedrine with intent to manufacture methamphetamine, which require knowledge of the presence of the drug or ingredients thereof, we question how the jury could convict Appellant on the endangerment charge which requires knowledge of those very same things.

Since we find that the State failed to prove that there was an actual, and not potential, danger to Appellant's son while he was in the trailer, the trial court should have granted Appellant's motion for judgment of acquittal because there was insufficient evidence to support a finding that Appellant's son's presence at the mobile home presented an actual risk to him. See, e.g., *Hunter*, 939 S.W.2d at 545. As such, we need not conclusively determine the issue of Appellant's knowledge.

Accordingly, because there was not sufficient evidence from which a reasonable trier of fact could have found Appellant guilty beyond a reasonable doubt of endangering the welfare of a child in the first degree, we find that the trial court erred in overruling Appellant's motions for judgment of acquittal at the close of all of the evidence and for judgment notwithstanding the verdict. Appellant's point on appeal is granted.

### Conclusion

The judgment of conviction and the sentence of the trial court are reversed.

WILLIAM H. CRANDALL, JR., P.J., and GLENN A. NORTON, J., concur.