Filed 7/2/24  P. v. Issac CA5

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

### IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

### FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>DONTE TIMOTHY ISSAC,<br><br>    Defendant and Appellant. | F084494<br><br>(Super. Ct. No. BF182246A)<br><br><br>**OPINION** |

-ooOoo-

APPEAL from a judgment of the Superior Court of Kern County.  John D. Oglesby, Judge.

William J. Capriola, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Louis M. Vasquez, Lewis A. Martinez and William K. Kim, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

**SEE CONCURRING OPINION**

## INTRODUCTION

Donte Timothy Issac was convicted of second degree murder and felony child abuse. He argues this court should revisit the California Supreme Court's ruling in *People v. Elmore* (2014) 59 Cal.4th 121 (*Elmore*) and find that imperfect self-defense may be based on a purely delusional belief of the need to defend oneself. Appellant further argues there is insufficient evidence to support the felony child abuse conviction, and there is insufficient evidence to support the trial court's finding that appellant's prior conviction for discharging a firearm in a grossly negligent manner qualifies as a prior strike and serious felony enhancement. We reverse the true finding that appellant's prior conviction for violating Penal Code section 246.3[1] was a serious felony, vacate the sentence and remand the matter for retrial at the People's election. The judgment is otherwise affirmed.

## PROCEDURAL HISTORY

On April 21, 2022, the Kern County District Attorney filed an amended information charging appellant with willful, deliberate, and premeditated murder (§ 187; count 1), and felony child abuse (§ 273a, subd. (a); count 2). The district attorney further alleged appellant personally used a deadly weapon as to count one (§ 12022, subd. (b)(1)) and had a prior conviction for violating section 246.3, discharging a firearm in a grossly negligent manner, alleged a serious felony conviction which qualified as a strike (§§ 667, subds. (a), (c)-(j), 1170.12, subds. (a)-(e)), as well as a number of aggravating circumstances as to each count.

On April 27, 2022, a jury found appellant guilty of second degree murder and felony child abuse, found true appellant personally used a deadly or dangerous weapon in the commission of the murder, and found all but one aggravating circumstance true as to

---

[1] All further undesignated statutory references are to the Penal Code unless otherwise stated.

each count.  On May 2, 2022, the trial court found the prior strike and serious felony allegations against appellant true.

On June 2, 2022, appellant was sentenced to an aggregate term of 36 years to life. The trial court imposed a sentence of 15 years to life on count one, doubled due to the prior strike, five years for the prior serious felony enhancement, and one year for the personal use of a deadly weapon enhancement.  The trial court also sentenced appellant to 12 years on count two (the upper term of six years, doubled), plus five years for the prior serious felony enhancement.  The sentence on count two was ordered to run concurrently.

**STATEMENT OF FACTS**

At around 6:00 a.m. on August 24, 2020, after having barricaded himself and his five-year-old daughter in a room for hours, appellant attached a kitchen knife to a broom handle and stabbed his mother to death in her bedroom.

*Events leading up to the murder.*

Appellant had been living with his five-year-old daughter, A.I., and mother, Stephanie Body, in his mother's apartment for over a decade.  Until a month or two prior to the murder, appellant was described as normal and friendly.

On July 4, 2020, appellant admitted to using methamphetamine.  That same day, he sent a message to his neighbor, Kayla M. asking her if she or Kayla M.'s husband saw "people" watching appellant masturbate.  Kayla M. later spoke with Body, who told her that appellant mentioned another resident of the apartments, Steven H., appellant's childhood friend.  From then on, Steven H. became appellant's reoccurring ghost.[2]

Appellant's half brother, F.B., noticed appellant's change in behavior.  Several months prior to the murder, appellant met with F.B. and told him that cars were following him through the neighborhood, a claim F.B. determined was false.  Later, appellant told

---

[2]     Steven H. testified at trial and stated that he worked 10 hours a day and never spent any time outside of appellant's window or threatened to kill appellant.

F.B. that Steven H. was standing outside of his window. F.B. asked why Steven H. would not just come in the house, but appellant did not have an answer. F.B. knew Steven H. as the son of Body's friend and did not know Steven H. to be aggressive or have a reason to behave the way appellant described. F.B. used to live with Body and was a gun owner but confirmed that he took his gun when he moved out and did not give Body access to his gun.

On July 15, 2020, officers responded to Body's apartment for a welfare check. Appellant spoke with the officers and told them he saw someone peeping on him through his bedroom window. Appellant was voluntarily transported to a mental health facility for an evaluation.

At the mental health facility, appellant told staff that he used marijuana every day, and used methamphetamine about five times that year. He told staff that Steven H. was terrorizing him but denied having auditory or visual hallucinations. Staff also spoke with Body, who told them that appellant believed that Steven H. was "after him." Appellant had put a curtain, a sheet and a blanket over his bedroom window but still felt like Steven H. could look into the room. Appellant was up all night and would wake Body up saying that Steven H. was outside. Appellant also called Steven H.'s mother and told her to come pick Steven H. up, because he was outside appellant's window.

That day appellant tested positive for THC and amphetamine. However, he was not placed on an involuntary hold but was scheduled a follow-up appointment on July 18, 2020, which appellant did not attend. He left the facility at around 11:00 p.m. that night.

Appellant returned to the mental health facility on July 16, 2020. He appeared disheveled and was rambling about people talking to him through his earbuds. He was given a combination of medication to help with his hallucinations, and to help him sleep. He slept for roughly 14 hours and left the facility on the morning of July 17, 2020.

4.

On August 14, 2020, T.G., Steven H.'s mother, called 911 because appellant appeared at her door. Appellant said that Steven H. had been looking through the window at him and his daughter and appellant was going to kill him.

On August 23, 2020, appellant called 911 and reported that someone was "reflecting" a gun at him in his room. Officers were dispatched to speak with appellant. Appellant told the officers that Steven H. was pointing a gun at him through cracks in the ceiling. Appellant also showed the officers a picture or video that appellant believed showed Steven H. pointing the gun. However, while appellant acted like he could still see what was on the picture or video, the officers saw nothing. Appellant refused to return to the mental health facility for further treatment.

*Stephanie Body's Murder*

On August 24, 2020, appellant contacted 911 three times, first at 12:42 a.m., then at 1:46 a.m., and finally at 4:53 a.m. before killing Body sometime around 6:00 a.m. No officers were dispatched until both appellant and Kayla M. called 911 at 6:26 a.m.

At 6:26 a.m. Kayla M. told the 911 dispatcher that appellant was banging on her door very hard, holding some sort of stick. Appellant said that he just killed his mom, and he did not know why, but something was messing with his head. He was wearing only shorts and had his daughter with him.

Appellant called dispatch at almost exactly the same time as Kayla M. and told the dispatcher that he was being held hostage and drugged by a lady that stole him from his mom when he was a baby, and Steven H. put her up to it. Appellant said he stabbed her because she was trying to kill him, and that she "goes by" Stephanie Body. Appellant said he and his daughter were in the apartment laying in the bathtub. The dispatcher stayed on the phone with appellant until police arrived and took appellant into custody without issue.

In an interview with officers later that day, appellant described what happened in the apartment. Appellant began by stating that Body was not his mother, but had stolen

5.

him away from his biological mother, and sold him to Steven H. for a dollar and a pack of cigarettes. Appellant admitted he killed her trying to defend himself and his daughter.

Sometime that night, appellant grabbed a block of knives from the kitchen and barricaded himself in his bedroom with his daughter. At around 1:00 or 2:00 a.m., appellant attached a chef's knife to a stick using a shoelace, a phone cord and a shirt. Appellant did so because after calling 911 twice, no officers showed up and appellant "[felt] like the situation [was] heatin' up." It took appellant five to 10 minutes to make the "spear" because the items in the room were "all scattered." F.B. would later testify the bedroom was "thrashed," and an officer would describe the dresser in the bedroom as "overturned."

Appellant also started pulling drawers out of the dresser and putting them around the child's bed in the bedroom. Three smaller kitchen knives ended up vertically stuck in the bottom side of one of these drawers. Appellant then sat next to his daughter's bed and watched cartoons with his daughter for an unspecified amount of time. He also walked around the house and checked on Body, and everything was "fine."

Appellant told the officers he smoked methamphetamine and weed every day, but denied he was hallucinating and said he did it for "energy." He last smoked methamphetamine at 2:00 or 3:00 a.m. that day, although it was unclear whether he did so in his bedroom or in the apartment.

Appellant said at some point Steven H. began yelling at him from the window that he sold his soul to the devil and appellant and his daughter were sacrifices, that Steven H. was going to shoot appellant in the head and that Steven H. was going to shoot Body.[3] Appellant also believed Steven H. had hostages all around the apartment, one of which

---

[3]    Appellant also described a number of other beliefs throughout the interview, including being sexually assaulted by Steven H., Body, and prior girlfriends, that Body was a demon or the devil, that Steven H. sold appellant's soul to Body for a million dollars, and that Steven H. and Body were harming or threatening appellant's daughter.

6.

told appellant, " 'Before [Body] woke up she got a gun under one of them pillows,' " and "the deadline was 6 o'clock."

At some point appellant moved his daughter to the bathtub in the bathroom. Appellant took the "spear" with him in case Steven H. "tried to … barge in.…" Appellant then woke Body up and told her Steven H. was threatening to kill her. Body said, "I don't care" and appellant returned to the bathroom. Body then went to the kitchen, and appellant followed her, telling her to leave the kitchen because of the "window." Body then returned to the bedroom, walking past appellant in the hallway.

The entire time, appellant had the "spear" he fabricated in his hand, knife side facing downward. Body went toward the bed in the bedroom and tried to close the door. Appellant told Body " 'Why are you not believin' me? I'm tryin' to save us.' " Body replied, " 'Hey. Why the fuck are you trippin' Don? Why are you still on this bullshit?' "

Appellant said Steven H. told him, " 'She got a nine under her pillow anyway. If I don't do it she gonna do it.' " Body sat down on the bed. Appellant then flipped over one of the pillows on the bed. Body got mad and reached over toward the other pillow. Believing Body was reaching for a gun under the second pillow, appellant stabbed Body twice with the "spear" in her chest. Body grasped the knife and pulled it off of the stick. One stab wound hit Body's right lung, and the other her heart — injuries which caused death within minutes. Appellant then grabbed his daughter out of the bathtub and ran outside.

## DISCUSSION

I.     A PURELY DELUSION BELIEF IN THE NEED TO DEFEND ONESELF DOES NOT OBVIATE MALICE

Appellant concedes that this court is bound by the California Supreme Court ruling in *Elmore, supra,* 59 Cal.4th 121. Nonetheless, he urges this court to consider the reasoning of Justice Joyce L. Kennard in her concurring and dissenting opinion in *Elmore* and Justice Goodwin H. Liu in his concurring opinion in *People v. Schuller* (2023)

7.

15 Cal.5th 237 (*Schuller*) and find that imperfect self-defense obviates malice even when the need to defend oneself is entirely delusional.  We respectfully decline to do so.

A. *Legal Standard*

"Murder is the unlawful killing of a human being … with malice aforethought." (§ 187, subd. (a).)  Malice may be express or implied.  (§ 188, subd. (a).)  Malice is express when there is manifested a deliberate intention to unlawfully take away the life of a fellow creature.  (§ 188, subd. (a)(1).)  Malice is implied when no considerable provocation appears, or when the circumstances attending the killing show an abandoned and malignant heart.  (§ 188, subd. (a)(2).)

" 'A killing with express malice formed willfully, deliberately, and with premeditation constitutes first degree murder.' [Citation.]  'Second degree murder is the unlawful killing of a human being with malice aforethought but without the additional elements, such as willfulness, premeditation, and deliberation, that would support a conviction of first degree murder.' [Citation.]  Thus, the mens rea required for murder is malice, express or implied." (*Elmore, supra,* 59 Cal.4th at p. 133.)

Manslaughter, a lesser included offense of murder, is an unlawful killing without malice.  (§ 192.)  There are three types of manslaughter, but the type relevant to the instant case is voluntary manslaughter.  (§ 192, subd. (a).)  "Two factors may preclude the formation of malice and reduce murder to voluntary manslaughter: heat of passion and unreasonable self-defense." (*Elmore, supra,* 59 Cal.4th at p. 133.)

"Self-defense, when based on a *reasonable* belief that killing is necessary to avert an imminent threat of death or great bodily injury, is a complete justification, and such a killing is not a crime." (*Elmore, supra,* 59 Cal.4th at pp. 133–134.)  Unreasonable self-defense is the " ' "the unreasonable but good faith belief in having to act in self-defense [citations]." ' " (*People v. Rios* (2000) 23 Cal.4th 450, 460, fn. omitted.)  This "*[I]mperfect self-defense* obviates malice because that most culpable of mental states

8.

'cannot coexist' with an actual belief that the lethal act was necessary to avoid one's own death or serious injury at the victim's hand." (*Id.* at 461.)

In *Elmore*, the California Supreme Court explained unreasonable self-defense is a theory based upon a defendant's assertion that he acted under an unreasonable mistake of fact, a mistake caused by the circumstances rather than by "cognitive defects alone." (*Elmore, supra,* 59 Cal.4th at p. 136.) The Supreme Court distinguished the legal lineage of unreasonable self-defense from that of both heat of passion, and, more importantly, the now defunct defense of diminished capacity. (*Id.* at p. 135.) The Court noted that when the diminished capacity defense was still viable, delusional defendants were treated under its rubric, while those cases involving factual misperceptions were analyzed in terms of unreasonable self-defense. (*Id.* at p. 136, see also *People v. Mejia-Lenares* (2006) 135 Cal.App.4th 1437, 1448–1449.)

"[U]nreasonable self-defense, as a form of mistake of fact, has no application when the defendant's actions are entirely delusional. A defendant who makes a factual mistake misperceives the objective circumstances. A delusional defendant holds a belief that is divorced from the circumstances. The line between mere misperception and delusion is drawn at the absence of an *objective correlate*. A person who sees a stick and thinks it is a snake is mistaken, but that misinterpretation is not delusional. One who sees a snake where there is nothing snakelike, however, is deluded. Unreasonable self-defense was never intended to encompass reactions to threats that exist only in the defendant's mind." (*Elmore, supra,* 59 Cal.4th at pp. 136–137, italics added.)

"A claim of unreasonable self-defense based solely on delusion is quintessentially a claim of insanity under the *M'Naghten*[4] standard [*M'Naghten's Case* (1843) 8

---

**4**    "In any criminal proceeding, including any juvenile court proceeding, in which a plea of not guilty by reason of insanity is entered, this defense shall be found by the trier of fact only when the accused person proves by a preponderance of the evidence that he or she was incapable of knowing or understanding the nature and quality of his or her act

Eng.Rep. 718] of inability to distinguish right from wrong. Its rationale is that mental illness caused the defendant to perceive an illusory threat, form an actual belief in the need to kill in self-defense, and act on that belief without wrongful intent." (*Elmore, supra,* 59 Cal.4th at p. 140.) "Accordingly, a claim of delusional belief in the need for self-defense is reserved for the sanity phase, where it may result in *complete exoneration* from criminal liability. [Citation.] It may not be employed to *reduce* a defendant's degree of guilt." (*Id*. at p. 145.)

### B. *Analysis*

Appellant asks this court to reconsider *Elmore*. Appellant notes the jury in this case was instructed with CALCRIM No. 627, which states in part, "You may consider evidence of hallucination or delusions, if any, in deciding whether the defendant acted with deliberation and premeditation. [¶] Evidence of a hallucination or delusion as well as medical deficiencies or psychological dysfunction is … inadmissible to negate malice so as to mitigate murder to voluntary manslaughter. But is admissible to negate deliberation and premeditation so as to negate first-degree murder to second-degree murder." Appellant concludes that because he was convicted of second degree murder, it was obviously prejudicial to tell the jury that hallucinations and/or delusions could negate deliberation and premeditation but not malice.

Justice Kennard argued in her concurring and dissenting opinion in *Elmore*, that "[a]ny genuine belief in the need for self-defense precludes a murder conviction" — the "unreasonable belief … may stem from mental illness, negligence, subaverage intelligence, or a variety of other causes." (*Elmore, supra,* 59 Cal.4th at 150, conc. & dis. opn. of Kennard, J., joined by Werdegar & Liu, JJ.) Justice Kennard posited that a genuine but unreasonable belief in the need for self-defense that stems entirely from

---

and of distinguishing right from wrong at the time of the commission of the offense." (§ 25, subd. (b).)

delusion nonetheless obviates malice — " '[a] defendant's mental state is the same when he kills in the honest-but-mistaken belief that the victim was reaching for a gun whether such belief is the product of a delusion or a mistaken interpretation of the victim's reaching for his car keys.' " (*Id.* at p. 151.) Likewise, a genuine but delusional belief in the need for self-defense is also a mistake of fact — it is a mistake that "an attack is occurring or is about to occur." (*Ibid.*)

Justice Kennard noted section 28, subdivision (a) specifically makes evidence of mental disease, defect or disorder admissible solely on the issue of whether or not the accused " '*actually* formed a required specific intent, premeditated, deliberated, or *harbored malice aforethought*, when a specific intent crime is charged.' " (*Elmore, supra,* 59 Cal.4th at 150, conc. & dis. opn. of Kennard, J., italics added in original.) Thus, removing the question of the effect of hallucinations or delusions on the formation of malice, from the guilt phase "cannot be reconciled with the plain language of section 28's subdivision (a)." (*Id.* at p. 152.)

Finally, Justice Kennard concluded the majority's ruling did not remove the question of sanity from the guilt phase and confine it to the sanity phase. (*Elmore, supra,* 59 Cal.4th at 152, conc. & dis. opn. of Kennard, J.) Jurors must still determine whether a defendant's belief is based at least partially on fact or entirely on delusions caused by mental illness, an "unenviable task" which nonetheless requires jurors to contemplate the defendant's sanity during the guilt phase. (*Ibid.*)

In *Schuller, supra,* 15 Cal.5th 237, Justice Liu likewise disagreed with the majority holding *Elmore* "that a defendant may not argue imperfect self-defense based on a 'purely delusional belief in the need to act in self-defense.' " (*Schuller,* at pp. 265–266, conc. opn. of Liu, J., joined by Evans, J.)

Justice Liu argued "self-defense requires a defendant to genuinely believe that he or she is 'in imminent danger of being killed or suffering great bodily injury' and that 'the immediate use of deadly force [is] necessary to defend against the danger.' [Citation.]

But because a 'purely delusional' belief in the need for self-defense may be just as genuine as a belief based on an 'objective correlate,' it is not clear what supports *Elmore's* conclusion that a defendant's claim of imperfect self-defense must be grounded in objective reality.  Such an assessment goes to the reasonableness of a defendant's belief — a consideration necessary to perfect self-defense but irrelevant to imperfect self-defense, which is by definition unreasonable." (*Schuller, supra,* 15 Cal.5th at p. 266, conc. opn. of Liu, J.)

Justice Liu notes that *Elmore's* holding requires "highly subjective line drawing," between what qualifies as an " 'objective correlate' " and that "[t]his unguided inquiry is compounded by the equally subjective challenge of determining, in the chain of events leading a defendant to have an unreasonable belief in the need for self-defense, at what temporal or causal point an objective correlate must be found." (*Schuller, supra,* 15 Cal.5th at 267, conc. opn. of Liu, J.)

In whole, Justice Liu concludes, "All of this is unnecessarily confusing and complicated.  Requiring an 'objective correlate' in order to assert imperfect self-defense is inconsistent with the requirement of malice to prove murder.  Because '[t]he unreasonable belief in the need for self-defense may stem from mental illness, negligence, subaverage intelligence, or a variety of other causes … [,] it should not matter why the killer perceived a need for self-defense.' " (*Schuller, supra,* 15 Cal.5th at 267, conc. opn. of Liu, J.)

Respectfully, while Justice Kennard's and Justice Liu's arguments are both well-reasoned and compelling, as an interim court we are bound by the ruling in *Elmore.* Under the doctrine of stare decisis, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

II.     THE FELONY CHILD ABUSE CONVICTION IS SUPPORTED BY
        SUBSTANTIAL EVIDENCE

Appellant argues there is insufficient evidence to support the felony child abuse conviction, because there was no likelihood of great bodily harm or death to A.I.  We disagree.

A.  *Legal Standard*

"Any person who, under circumstances or conditions likely to produce great bodily harm or death, willfully causes or permits any child to suffer, or inflicts thereon unjustifiable physical pain or mental suffering, or having the care or custody of any child, willfully causes or permits the person or health of that child to be injured, or willfully causes or permits that child to be placed in a situation where his or her person or health is endangered…" commits felony child abuse pursuant to section 273a, subdivision (a).

"[Section 273a, subdivision (a)] is intended to protect children from situations in which the 'probability of serious injury is great.' [Citation.]  The risk need not be life threatening, as long as there are risks of great bodily harm.  [Citation.]  One can be criminally culpable for violating the statute through a course of conduct as well as by a specific act.  [Citation.]  Further, '[f]or the felony punishment there is no requirement that the actual result be great bodily injury.' " (*People v. Odom* (1991) 226 Cal.App.3d 1028, 1033 (*Odom*).)

Conditions "likely" to produce great bodily harm or death are such where "there existed a substantial danger, that is, a serious and well-founded risk, of great bodily harm or death to the child." (*People v. Wilson* (2006) 138 Cal.App.4th 1197, 1205.)

On appeal, this court " 'must determine whether a reasonable trier of fact could have found the prosecution sustained its burden of proving the defendant guilty beyond a reasonable doubt.' " (*People v. Johnson* (1980) 26 Cal.3d 557, 576.)  We "examine the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—evidence that is reasonable, credible and of solid value—such that

13.

a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.) "If the circumstances reasonably justify the fact finder's findings, a contrary finding reasonably reconciled with the circumstances does not warrant reversal of the judgment." (*In re L.K.* (2011) 199 Cal.App.4th 1438, 1446.) " 'Unless it is clearly shown that "on no hypothesis whatever is there sufficient substantial evidence to support the [jury's] verdict[s,]" we will not reverse.' " (*People v. Perez* (2008) 164 Cal.App.4th 1462, 1469.)

    B.  *Analysis*

Appellant argues there is not sufficient evidence for a reasonable trier of fact to find beyond a reasonable doubt that appellant's conduct caused A.I. to be endangered under circumstances likely to produce great bodily harm or death. Appellant points out that it is unclear where A.I. was at the time of the actual killing and argues there is no evidence A.I. was even awake when she was barricaded in the bedroom with appellant.

Primarily, we agree with appellant that there is no evidence A.I. was in the room with him when appellant killed Body. At one point appellant tells officers:

> "[APPELLANT:] …because one of the hostages that was around, I think it was upstairs or next door, was like 'Before she woke up she got a gun under one of them  pillows.'
>
> "[OFFICER:] Mm-hm.
>
> "[APPELLANT:] And I never thought – 'cause I had my daughter in the room with me – I never thought, 'Hey go check.'  So I'm like, 'Okay.'  So she sits down and she reaches for it.  And I'm just like – and then, like, we just go at it."

The Attorney General interprets appellant's statement as admitting A.I. was in the bedroom with appellant when appellant stabbed Body.  However, in the context of the entire interview, it appears appellant is referring to a point in time prior to the stabbing and describes how he chose not to check on the "hostage's" warning at that time because his daughter was in the bedroom with him.  Likewise, the People argued in closing,

14.

"[W]e don't know exactly where [A.I.] was at the time of the murder itself…."  It would not be reasonable to infer from the record that A.I. was in the room with appellant when appellant killed Body.

Nonetheless, reviewing the record as a whole, the evidence is sufficient to support a conviction of felony child abuse.  Sometime in the night between August 23, 2020 and August 24, 2020, appellant grabbed a block of knives and barricaded himself in his bedroom with his daughter.  The room was described as "thrashed," items in the room "scattered," the dresser "overturned," and the window covered with blankets and sheets.

Appellant made several 911 calls, and when officers did not show up, he began constructing a makeshift "spear" out of a stick and a chef's knife at around 1:00 or 2:00 a.m. in A.I.'s presence.  He also pulled out drawers from the dresser, which was either already overturned, or was overturned at some point in the night, and stacked them against A.I.'s bed.  Because three smaller kitchen knives were found stabbed into one of these drawers, it is reasonable to infer at some point appellant pulled these knives out of the knife block and stabbed them into the drawer in A.I.'s presence.

Appellant argues there is no evidence that A.I. was even awake at this time.  However, appellant told officers that after making the "spear" he watched cartoons with A.I.  It is reasonable to infer that A.I. was awake up to and around the point in time appellant fabricated the "spear."

Appellant then told officers he smoked methamphetamine at 2:00 or 3:00 a.m.  Appellant insisted he does not smoke it in the bedroom unless he is there by himself.  However, the jury could reasonably find appellant was not being truthful, given that he previously stated that he "barricaded" himself in the bedroom with his daughter.  Regardless, either appellant smoked methamphetamine in the bedroom with A.I. present or appellant left his daughter alone in a "thrashed" bedroom with knives sticking out of drawers stacked against her bed, while appellant smoked methamphetamine elsewhere.

15.

The Attorney General argues that appellant's hallucinations and delusions also presented a risk of serious physical harm to those around him. Appellant in turn argues that the evidence only shows that he was trying to protect A.I. at the time. Appellant asserts there is no evidence to support the inference that the probability of great bodily injury to A.I. was great based on appellant perceiving her as a threat to his life.

Appellant is correct that there is no evidence that his hallucinations and delusions caused him to directly threaten A.I. with violence, and evidence does show appellant was trying to keep A.I. safe that night. And, a reasonable trier of fact would not find appellant's hallucinations and delusions, alone, were circumstances likely to produce great bodily harm or death to A.I.

However, much like section 273a, subdivision (a) does not require a defendant to *cause* great bodily harm to the victim, it does not require that the condition creating a likelihood of great bodily harm or death be directed or targeted at the victim. (See *Odom, supra,* 226 Cal.App.3d at p. 1033.) In other words, appellant need not have perceived A.I. as a threat for his behavior to create a likelihood of great bodily harm or death to A.I.

In *Odom,* the defendant was convicted of felony child abuse based on the dangerous condition of the home. (*Odom, supra,* 226 Cal.App.3d at p. 1032.) The evidence described an unsanitary home, with overflowing trash cans and spoiled food, toxic, flammable, combustible and improperly stored chemicals throughout the home, "jerryrigged" and exposed wiring and charred rafters, indicating prior fires. (*Id.* at pp. 1033–1035.)

The defendant suggested his children, ages nine and seven, were not in danger because there were numerous adults on the premises to supervise them. (*Odom, supra,* 226 Cal.App.3d at p. 1035.) The appellate court was unconvinced, finding "it is difficult to understand how the children would have been protected even if their movements were severely monitored." (*Ibid.*) The court noted that even if the situation was temporary, "[t]he dangers created in the home were so hazardous that … the existence of the hazards

16.

even for a short time sufficiently endangered the well-being of the children to be a violation of [section 273a, subdivision (a).]" (*Ibid.*)

This case is not nearly as extreme as *Odom*. But much like in *Odom*, in this case appellant placed A.I. in a significantly unsafe environment in the bedroom. The term "barricaded" implies that appellant locked A.I. in the bedroom or at least prevented her from leaving on her own terms. Inside, the bedroom was "thrashed" and "scattered," with overturned furniture and dresser drawers with knives sticking out stacked near A.I.'s bed. If we accept appellant's contention that he did not smoke methamphetamine in the bedroom with A.I., that means he left her alone in the room with the knives within reach.

Appellant may argue he was supervising her or trying to protect A.I., however, his actions that night only exacerbated the likelihood of causing A.I. great bodily harm. We want to emphasize again that we do not find that appellant's hallucinations and delusions alone were likely to cause A.I. great bodily harm or death. But in addition to suffering from these disturbing auditory and visual hallucinations, appellant chose to arm himself with a makeshift deadly weapon by tying a chef's knife to a stick with phone cords, shoelace and cloth. It is reasonable to infer from the evidence that appellant then carried the "spear" with him for the remainder of the night. And appellant chose to impair himself further by smoking methamphetamine. Finally, evidence shows appellant had begun to respond to his hallucinations and delusions with violence — on August 14, 2020, appellant had told T.G. that he was going to kill Steven H. because Steven H. had been looking through the window at him and his daughter. And ultimately, he stabbed Body due to his delusional beliefs.

Taken together, there is substantial evidence that appellant barricading himself in the bedroom with A.I. in the early morning of August 24, 2020, created a likelihood of great bodily harm or death to A.I. The room itself was unsafe, with knives haphazardly stuck to furniture within reach of A.I. Appellant may have smoked methamphetamine in A.I.'s presence, or left A.I. alone in the room without supervision while he did so. And

appellant was impaired due to being high on methamphetamine and due to suffering from persistent visual and auditory hallucinations which were threatening to kill him, to which he was ready to react with lethal violence. Appellant threatened to kill Steven H., manufactured a deadly weapon, and kept himself armed with it throughout the night.

Even though the evidence did not show appellant hallucinated about or was violent toward A.I. due to his hallucinations, a reasonable jury could find there was a likelihood — "a serious and well-founded risk" — appellant would lash out violently at his hallucinations with the deadly weapon in his possession and in the process cause great bodily harm to A.I. while she was barricaded in the room with appellant, causing her great bodily harm or death. (*People v. Wilson, supra,* 138 Cal.App.4th at p. 1205.) Therefore, substantial evidence supports the jury's finding that appellant placed five-year-old A.I. in "circumstances or conditions likely to produce great bodily harm or death" for purposes of section 273a, subdivision (a).

III. THERE IS INSUFFICIENT EVIDENCE THAT APPELLANT'S PRIOR CONVICTION FOR VIOLATING SECTION 246.3 QUALIFIES AS A SERIOUS FELONY

Appellant argues there is insufficient evidence to support the trial court's true finding that appellant's conviction for violating section 246.3, discharging a firearm in a grossly negligent manner, qualified as a prior serious felony and a strike prior. The Attorney General concedes the true finding should be reversed and asks this court to remand the matter to give the district attorney the opportunity to retry the prior serious felony conviction enhancement allegation. The Attorney General does not directly address whether appellant's prior conviction qualifies as a strike prior. We reverse the finding that appellant's section 246.3 conviction for discharging a firearm in a grossly negligent manner was a serious felony, vacate the sentence and remand for retrial at the People's election.

*A. Background*

In the amended complaint, the district attorney alleged on June 18, 2019, appellant was convicted of violating section 246.3, discharging a firearm in a grossly negligent manner, and the conviction qualified as a serious felony for purposes of the "Three Strikes" law (§§ 667, subds. (a), (c)–(j), 1170.12, subds. (a)–(e)). The district attorney further alleged the conviction qualified as a prior serious felony within the meaning of section 667, subdivision (a).

On May 2, 2022, in a bifurcated proceeding, the People introduced appellant's booking photo, the docket in appellant's prior case,[5] and appellant's rap sheet into evidence. After reviewing the exhibits, the trial court found true appellant's prior conviction qualified as both a prior strike and a serious felony conviction.

*B. Legal Standard and Analysis*

A prior conviction qualifies as a strike for purposes of the Three Strikes law, if it is a violent felony as defined by section 667.5, subdivision (c) or a serious felony as defined by section 1192.7, subdivision (c). (§§ 667, subd. (d)(1); 1170.12, subd. (b)(1).) A prior conviction also qualifies for a five-year prison sentence enhancement pursuant to section 667, subdivision (a) if it is a serious felony as defined by section 1192.7, subdivision (c). (§ 667, subd. (a)(4).)

The People in this case presented evidence only of appellant's conviction, and not any information regarding the conviction's underlying facts. Thus, the People "proved nothing more than the least adjudicated elements" of the prior conviction. (*People v. Rodriguez* (1998) 17 Cal.4th 253, 262.)

A violation of section 246.3 is not specifically listed as a violent felony under section 667.5, subdivision (c) or a serious felony under section 1192.7, subdivision (c). It is "possible to be convicted of grossly negligent discharge of a firearm under section

---

[5] Case No. FB175155A.

246.3 without personally using a firearm, e.g., as an aider and abettor." (*People v. Golde* (2008) 163 Cal.App.4th 101, 112.)  Therefore, a violation of section 246.3 can only be used as a strike or serious felony if appellant personally used the firearm.  (§§ 1192.7, subd. (c)(8), (23).)

Because there was no admission or evidence that appellant personally used a firearm, which would qualify his prior section 246.3 conviction as a serious felony pursuant to section 1192.7, subdivision (c) for both strike and enhancement purposes, the trial court's true finding was in error.  We therefore reverse the finding, vacate the sentence and remand the matter for retrial at the People's election.  (See *People v. Barragan* (2004) 32 Cal.4th 236.)

## DISPOSITION

We reverse the true finding that appellant's prior conviction for violating section 246.3, discharging a firearm in a grossly negligent manner was a serious felony pursuant to section 1192.7, subdivision (c), vacate the sentence and remand the matter for retrial at the People's election. The judgment is otherwise affirmed.

FRANSON, J.

I CONCUR:

DESANTOS, J.

20.

POOCHIGIAN, Acting P. J., Concurring.

I concur with the opinion but do not necessarily adopt the majority's characterization of the dissents in *People v. Elmore* (2014) 59 Cal.4th 121 and *People v. Schuller* (2023) 15 Cal.5th 237 being "*well-reasoned and compelling*." (Maj. opn., *ante*, at p. 12, italics added.) I do not argue against or for the majority's favorable assessment of the dissents in those opinions. Instead, I simply adhere to the principle of stare decisis – which is consistent with the disposition in which I join.

POOCHIGIAN, Acting P. J.